# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-2635

———————

Sandra Lorena Menjivar,      *
     *
         Petitioner,      *
     *    Petition for Review of an
       v.      *    Order of the Board of
     *    Immigration Appeals.
Alberto Gonzales, Attorney General      *
of the United States of America,[1]      *
     *
         Respondent.      *

———————

Submitted: March 17, 2005
Filed: July 29, 2005(Corrected: 09/21/05)

———————

Before WOLLMAN, JOHN R. GIBSON, and COLLOTON, Circuit Judges.

———————

COLLOTON, Circuit Judge.

Sandra Lorena Menjivar petitions for review of a decision of the Board of Immigration Appeals ("BIA") denying her application for asylum and withholding of removal and relief under the Convention Against Torture. We deny the petition for review.

———————

[1]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Alberto Gonzales is automatically substituted for his predecessor, John Ashcroft, as respondent.

I.

Sandra Menjivar is a native and citizen of El Salvador who entered the United States on January 29, 2002. On February 8, 2002, the government initiated removal proceedings against her, and on October 28, 2002, Menjivar filed an application for asylum and related relief. At a hearing before an Immigration Judge ("IJ") on March 10, 2003, she testified to the circumstances of her departure from El Salvador. According to Menjivar, she first encountered a man named "Moncho" when she was fifteen. Moncho was a gang member who walked her home from school, made small talk, and eventually asked her to be his girlfriend. She declined, indicating that she was too young to have a boyfriend and that her mother would not approve of a boyfriend like Moncho. She testified that Moncho was angry that she had rejected him, and that he continued to spend time around her house.

On December 9, 1999, Menjivar was walking with her grandmother and niece when an unidentified man suddenly appeared and began shooting at them. Menjivar's grandmother was killed, and her niece was left paralyzed by a gunshot wound. The police were called, but because the nearest police station was one and one-half hours from Menjivar's town, they did not arrive until two hours after the shooting. When the police arrived at the scene, their investigation centered on the report of a bystander, who claimed to know Moncho. The bystander reported that Moncho was responsible for the shooting, and that Moncho wanted to kill Menjivar because she had refused to be his girlfriend. Menjivar testified that the police followed up with their investigation, but that she continued to feel afraid of Moncho.

Moncho did not reappear in Menjivar's hometown, and Menjivar heard from people in her village that Moncho had left the country for Honduras. About a year and a half after the shooting, a boy at Menjivar's school approached her and told her that someone was looking for her. When the boy described the person looking for Menjivar, the description matched Moncho. After the school year was over, Menjivar

went to stay with her sister in San Salvador, but she stated that she was still afraid that Moncho would find her. In January 2002, Menjivar left El Salvador and came to the United States through Mexico. Menjivar testified that Moncho is a member of a large gang, and she fears that he will find her if she returns to El Salvador.

The IJ adjudged Menjivar's testimony regarding the events in El Salvador to be "generally credible" and found that the evidence established that the shooting in her hometown had indeed taken place. However, the IJ found that Menjivar's harassment by Moncho was essentially a "personal problem," and not a result of her membership in a protected social group. He noted that Menjivar had not communicated any particular beliefs to Moncho in rejecting his advances. The IJ further found that this was not a case of "police neglect," and that nothing in the record suggested that the government ignored Menjivar's complaints. Based on these observations, the IJ concluded that Menjivar's situation was not covered by the asylum provisions of the Immigration and Nationality Act ("INA") or by the Convention Against Torture. The BIA affirmed the IJ's decision without opinion.

II.

Under the INA, the Attorney General may grant asylum to any alien who demonstrates that he is a "refugee" as defined by 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(b)(1). A "refugee" is a person who "is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of" his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Although Congress deleted the former "substantial evidence" standard of review from the applicable statute in 1996, we continue to review the administrative findings of fact to determine whether they are supported by substantial evidence on the record as a whole. *Menendez-Donis v. Ashcroft*, 360 F.3d 915, 917-18 (8th Cir. 2004); *see also Dia v. Ashcroft*, 353 F.3d

228, 248 & n.18 (3d Cir. 2003) (en banc). This means that findings of fact made by an IJ or the BIA are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Menendez-Donis*, 360 F.3d at 917-18; *see INS v. Elias-Zacarias,* 502 U.S. 478, 483-84 (1992). The Attorney General's discretionary decision whether to grant asylum "shall be conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D).

Menjivar's principal argument on appeal is that the IJ erred in determining that she is not a member of a protected social group. We find it unnecessary to reach this question, because we believe the IJ reasonably concluded that Menjivar failed to establish "persecution" within the meaning of the INA.

The BIA has adopted, and we have approved as reasonable, a definition of "persecution" that requires a harm to be "inflicted either by the government of [a country] or by persons or an organization that the government was unable or unwilling to control." *Valioukevitch v. INS*, 251 F.3d 747, 749 (8th Cir. 2001); *see Miranda v. INS*, 139 F.3d 624, 627 & n.2 (8th Cir. 1998); *In re Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985); *see also Matter of Pierre*, 15 I. & N. Dec. 461, 462 (BIA 1975) (stating the "unwilling or unable to control" standard for non-governmental persecution). We also accept as reasonable the BIA's view that an applicant seeking to establish persecution by a government based on violent conduct of a private actor must show more than "difficulty . . . controlling" private behavior. *In re McMullen*, 17 I. & N. Dec. 542, 546 (BIA 1980). Rather, the applicant must show that the government "condoned it or at least demonstrated a complete helplessness to protect the victims." *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000); *see also Roman v. INS*, 233 F.3d 1027, 1034 (7th Cir. 2000). We have said that an asylum claim based on actions by non-governmental parties fails where none of the incidents of abuse "occurred with the imprimatur" of government officials. *Valioukevitch*, 251 F.3d at 749. And the fact that police take no action on a particular report does not necessarily

-4-

mean that the government is unwilling or unable to control criminal activity, because there may be a reasonable basis for inaction. *Hasalla v. Ashcroft*, 367 F.3d 799, 804 (8th Cir. 2004); *but cf. In re O-Z- and I-Z-*, 22 I. & N. Dec. 23, 26 (BIA 1998) (upholding a grant of asylum where "the respondent reported at least three . . . incidents to the police, who took no action beyond writing a report"). Whether a government is "unable or unwilling to control" private actors under these refined definitions of persecution is a factual question that must be resolved based on the record in each case.

After considering the evidence of Moncho's criminal activity and the government's response thereto, the IJ made specific findings that "[w]e are not dealing with a situation here where the crime was ignored," and that "[t]his does not appear to be a case where the government was ignoring the claims or pleas of a target of unwanted attention or unwanted criminal contact." The IJ also concluded that there is "nothing in the record that would indicate that the police had been previously contacted about the unwanted advances . . . and then refused to provide protection." The IJ characterized the situation as a "personal problem" that was not covered by the asylum provisions of the INA.

We conclude that substantial evidence supports the IJ's conclusion that Moncho's actions should not be considered "persecution" attributable to the government of El Salvador.[2]  The police responded to the tragic shooting of

---

[2]At oral argument, Menjivar suggested that the administrative decision should not be sustained on this basis, because it was not relied upon by the IJ in his decision. While it is true that a reviewing court "may not uphold an agency decision based on reasons not articulated by the agency itself," *Mayo v. Schiltgen*, 921 F.2d 177, 179 (8th Cir. 1990), we believe based on the IJ's specific findings detailed above that "the agency's path may reasonably be discerned." *Chanmouny v. Ashcroft*, 376 F.3d 810, 812 (8th Cir. 2004) (internal quotation omitted). It is evident to us that one reason for the decision to deny asylum was the IJ's conclusion that Moncho's actions did not constitute persecution by the government of El Salvador.

Menjivar's relatives within two hours. In light of Menjivar's testimony that the nearest police station was one and one-half hours away and that it took a half-hour to find a telephone to summon the police, it is reasonable to conclude that law enforcement officials responded to the incident as quickly as possible. Menjivar argues that the police made inadequate or ineffective efforts to control Moncho's lawlessness, but Menjivar also testified that Moncho was angry at her precisely because "the police [were] looking for [him]." This testimony supports an inference not only that the police were pursuing Moncho, but also that their pursuit was effective enough that it provoked his anger. Menjivar testified, moreover, that she did not report Moncho's subsequent reappearance to the police, so the government had no opportunity to respond to this development.

Menjivar also submitted several newspaper articles describing the problem of gangs in El Salvador, in support of her contention that the police were "unable or unwilling" to control Moncho. These exhibits state that the gangs "often have [the police] outmaneuvered and outgunned," and that "critics" believe that the police force "has failed to put together a comprehensive anti-crime strategy and suffers from institutional weaknesses, such as inadequate supervision." To whatever extent these materials show that there is a general problem of gang violence in El Salvador, we do not believe they can override the evidence in this case that police conducted a thorough investigation of Moncho's criminal acts, and apparently forced him into hiding as a result.

Substantial evidence on the record as a whole supports the conclusion that the government responded to the report of Moncho's criminal activity, and acted upon the information that Menjivar and other witnesses provided. We deem the news articles regarding gang activity too general to dictate a conclusion that the Moncho's specific acts directed toward Menjivar were persecution by the government. This case is unlike *Mashiri v. Ashcroft*, 383 F.3d 1112 (9th Cir. 2004), cited by Menjivar, in which police "conducted very limited investigation, if any," and told the aliens that

they "better try to take care of [themselves]." *Id*. at 1121 n.5 (alteration in original). Therefore, we do not believe that a reasonable factfinder was compelled to conclude that the government of El Salvador was "unable or unwilling" to control Moncho, such that his criminal activity must be attributed to the government, and the decision to deny asylum was thus not contrary to law or an abuse of discretion. *See* 8 U.S.C. § 1252(b)(4)(D). It follows from our conclusion on the asylum claim that substantial evidence also supports the IJ's decision denying withholding of removal. *See Ismail v. Ashcroft,* 396 F.3d 970, 975 (8th Cir. 2005).

We also conclude that the IJ's decision to deny Menjivar's claim for relief under the Convention Against Torture was supported by substantial evidence. *See Mompongo v. Gonzales*, 406 F.3d 512, 514 (8th Cir. 2005) (standard of review). Under the Convention, Menjivar must demonstrate that it is more likely than not that she would be subjected to torture if returned to El Salvador, 8 C.F.R. § 208.16(c)(2), and that such torture would be inflicted "with the consent or acquiescence of a public official." 8 C.F.R. § 208.18(a)(1). "Acquiescence" at least requires prior awareness of the torture and a breach of a legal responsibility to intervene. 8 C.F.R. § 208.18(a)(7); *Lopez-Soto v. Ashcroft,* 383 F.3d 228, 240 (4th Cir. 2004).

The IJ found that the police did not ignore threats against Menjivar of which they had prior knowledge, and that the police did not "somehow acquiesce" in the commission of crimes against her. For the reasons discussed above, the evidence does not compel a finding that the El Salvadoran police have acquiesced or would acquiesce in Moncho's criminal activities. The newspaper articles at most demonstrate that the government has a problem controlling gang activity of which it is aware, but this is insufficient to compel a finding of willful blindness toward the torture of citizens by third parties. *See Lopez-Soto,* 383 F.3d at 240-41. We therefore find that substantial evidence supports the BIA's determination that Menjivar was not eligible for relief under the Convention Against Torture.

For the foregoing reasons, the petition for review is denied. Petitioner's motion to suspend ruling on appeal is also denied.

_____