**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LYDIA GARCIA-MILIAN,<br>*Petitioner*,<br><br>v.<br><br>ERIC H. HOLDER, JR., Attorney General,<br>*Respondent*. | No. 09-71461<br><br>Agency No.<br>A096-180-239<br><br><br>OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 9, 2013—Pasadena, California

Filed September 18, 2013

Before: Diarmuid F. O'Scannlain, Richard A. Paez, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Partial Concurrence and Partial Dissent by Judge Paez

## SUMMARY[*]

### Immigration

The panel denied a petition for review of the Board of Immigration Appeals' decision denying asylum, withholding of removal, and protection under the Convention Against Torture to a native and citizen of Guatemala because substantial evidence supported the determinations that petitioner was not persecuted on account of an imputed political opinion and that the attack she suffered did not occur with the acquiescence of the Guatemalan government.

The panel explained that masked mens' statements that they were looking for petitioner's common-law husband because he had been in a guerilla group did not establish whether the men imputed a political opinion to petitioner or merely wanted to extract information from her about her husband's whereabouts, and that the evidence in the record did not raise the inference that the men sought to punish petitioner for her association with her husband. The panel held that the evidence therefore did not compel the conclusion that petitioner was persecuted on account of an imputed political opinion.

The panel held that petitioner's testimony that the police declined to investigate the masked men's attack because they lacked sufficient information did not compel the conclusion that the police acquiesced in the attack, and that evidence that the government had been generally ineffective in preventing

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

or investigating criminal activities, absent evidence of corruption or other inability or unwillingness to oppose criminal organizations, did not raise an inference that public officials were likely to acquiesce in future torture.

Concurring in part and dissenting in part, Judge Paez agreed with the majority that the Board did not err in denying petitioner's CAT claim, but wrote that he believed the evidence in the record compelled the conclusion that petitioner was attacked and raped because of her ex-husband's political opinions.

## COUNSEL

Joubin P. Nasseri, Nasseri Law Group, Los Angeles, California, for Petitioner.

Tony West, Assistant Attorney General, Emily Anne Radford, Assistant Director, Nicole Murley and Jesse L. Busen (argued), Trial Attorneys, Office of Immigration Litigation, United States Department of Justice, Civil Division, Washington, D.C., for Respondent.

## OPINION

IKUTA, Circuit Judge:

Lydia Garcia-Milian, a native and citizen of Guatemala, petitions for review of the denial of her applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT) by the Board of Immigration Appeals (BIA). Because substantial evidence

supports the BIA's determinations that Garcia-Milian was not persecuted on account of an imputed political opinion and that the attack she suffered did not occur with the acquiescence of the Guatemalan government, we deny her petition.

I

Garcia-Milian entered the United States illegally in June 2003. After the government initiated removal proceedings, she conceded removability and, on May 3, 2004, applied for asylum, withholding of removal, and CAT relief. *See* 8 U.S.C. §§ 1158, 1231(b)(3); 8 C.F.R. § 208.18.

Garcia-Milian testified at the removal proceedings and the IJ concluded that her testimony was credible. According to Garcia-Milian, she lived in Salama, Guatemala, a small city of approximately 15,000 people. Between 1985 and 1989, she lived with Noe Garcia, her common law husband.[1] As a truck driver, Garcia was frequently away from Salama and would stay with Garcia-Milian for only two days each month. During the time they were together, Garcia never discussed politics or the ongoing civil war in Guatemala with Garcia-Milian, and never told her that he was in a guerilla group or organization. In approximately 1989, Garcia married another woman and did not return to Salama. Garcia-Milian did not have any further contact with him from that time forward.

---

[1] We use the term "common law husband" because Garcia-Milian testified that Noe was her husband but that they were never formally married. The record does not reveal the exact legal status of their relationship.

Around 2000, Garcia-Milian noticed two masked men following her when she was out shopping or going to school. This occurred around twenty times. Garcia-Milian did not report these incidents to the police because she did not think that the police would help her. Subsequently, in May 2003, the two masked men came to her home at night and demanded that she open the door. When she did so, they told her that they were looking for Noe Garcia because he had been in a guerilla group and ordered her to tell them his current whereabouts. Although she did not know where he lived, she lied and told them he was living in San Miguel (a non-existent city). The men subsequently beat and raped her. Before leaving, they told Garcia-Milian that if they could not find Garcia, they would return and kill her.

After the men left, Garcia-Milian took a taxi to her mother's home in another town. Garcia-Milian did not seek treatment at a hospital because she was afraid that the men would find out and kill her. Two days later, she reported the incident to the Salama police, who told her they could not investigate the incident because she could not identify her assailants. Fearing for her life, Garcia-Milian left Guatemala for Mexico, and then paid a "coyote" to smuggle her across the border into the United States.

In addition to testifying at the proceeding, Garcia-Milian submitted a State Department report on Guatemala titled *Country Reports on Human Rights Practices – 2006*, and four Amnesty International reports. The reports indicate that Guatemalan police had minimal training or capacity for investigating or assisting victims of sexual crimes, and that the Guatamalan government had been ineffective in investigating violence against women and homicides

generally, due to weaknesses throughout the criminal justice and law enforcement system.

The IJ denied Garcia-Milian's applications for asylum, withholding of removal, and CAT relief.  The BIA affirmed the IJ's decision.  It noted that "[w]hile the respondent appears to have been the victim of criminal acts on the several occasions described, she has not established a nexus between any incident and a protected ground under the Act." Based on its review of the record, the BIA concluded that there was "no evidence the respondent ever expressed a political opinion and no evidence to suggest that she was harmed based on any real or imputed political opinion."  As a result, the BIA denied Garcia-Milian's asylum and withholding of removal claims.  The BIA also rejected Garcia-Milian's CAT claim.  It held that the record did not establish that "it is more likely than not that the respondent will face torture by or with the acquiescence or willful blindness of an officer of the government of Guatemala."

II

We have jurisdiction under 8 U.S.C. § 1252 to review final orders of removal.  *Li v. Holder*, 656 F.3d 898, 904 (9th Cir. 2011).  We review the BIA's denials of asylum, withholding of removal, and CAT relief for "substantial evidence" and will uphold a denial supported by "reasonable, substantial, and probative evidence on the record considered as a whole."  *Kamalyan v. Holder*, 620 F.3d 1054, 1057 (9th Cir. 2010) (internal quotation marks omitted) (asylum); *Pagayon v. Holder*, 675 F.3d 1182, 1190 (9th Cir. 2011) (internal quotation marks omitted) (withholding of removal); *see Haile v. Holder*, 658 F.3d 1122, 1130–31 (9th Cir. 2011) (CAT relief).  In order to reverse the BIA, we must determine

"that the evidence not only *supports* [a contrary] conclusion, but *compels* it—and also compels the further conclusion" that the petitioner meets the requisite standard for obtaining relief. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). The agency's "[f]indings of fact are conclusive unless 'any reasonable adjudicator' would be compelled to conclude to the contrary." *Kamalyan*, 620 F.3d at 1057 (quoting 8 U.S.C. § 1252(b)(4)(B)).

A

We begin by considering Garcia-Milian's challenge to the BIA's denial of her asylum application.

Applicants for asylum bear the burden of proving eligibility for asylum. 8 C.F.R. § 208.13(a). In order to carry this burden, an applicant must first establish "refugee" status, 8 U.S.C. § 1158(b)(1) (2000), by proving past persecution or well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (2000).[2] Persecution is "on account of" a protected ground only where the persecution occurred "because of" that ground. *Elias-Zacarias*, 502 U.S. at 483; *Parussimova v. Mukasey*, 555 F.3d 734 739 (9th Cir. 2009). Accordingly, the persecutor's motive is "critical" and the applicant must come

---

[2] Under the REAL ID Act of 2005, an applicant for asylum must establish that a protected ground "was or will be at least one central reason for persecuting the applicant," in addition to proving that persecution was or will be "on account of" a protected ground. 8 U.S.C. § 1158(b)(1)(B)(i) (2006); *Parussimova v. Mukasey*, 555 F.3d 734, 738 (9th Cir. 2009). Because Garcia-Milian filed her asylum application before May 11, 2005, the effective date of the REAL ID Act, the pre-REAL ID standard applies to her case. *Sinha v. Holder*, 564 F.3d 1015, 1021 n.3 (9th Cir. 2009).

forward with "*some* evidence of [motive], direct or circumstantial." *Elias-Zacarias*, 502 U.S. at 483.

Here, Garcia-Milian based her asylum claim on the ground that the masked men persecuted her on account of her political opinion. Although she does not claim to have any political opinion of her own, an applicant "can also establish persecution on account of imputed political opinion—that is, on account of a political opinion attributed to him by his persecutors." *Navas v. I.N.S.*, 217 F.3d 646, 658 (9th Cir. 2000). "In establishing an imputed political opinion, the focus of inquiry turns away from the views of the victim to the views of the persecutor." *Sangha v. I.N.S.*, 103 F.3d 1482, 1489 (9th Cir. 1997). Therefore, the applicant for asylum must present evidence of the persecutor's views. A persecutor's statements attributing political views to the applicant may be persuasive evidence. "For example, one party to a conflict may insist to the victim that the victim is aligned with the other side." *Id.* (citing *Singh v. Ilchert*, 63 F.3d 1501, 1509 (9th Cir. 1995)). Similarly, persecutors' statements that they are retaliating against the victim for the political views of the victim's family would support an imputed political opinion claim. *Kebede v. Ashcroft*, 366 F.3d 808, 812 (9th Cir. 2004). In the absence of such direct evidence, an alien may point to "the applicant's association with, or relationship to, people who are known to hold a particular political opinion" in order to raise the inference that the persecutors have imputed a political view to the alien. *Navas*, 217 F.3d at 660. For example, evidence that "the applicant is a member of a large, politically active family many of whom have already been persecuted for their political beliefs" may raise the inference that persecutors have imputed or would impute the same political opinion to the applicant. *Sangha*, 103 F.3d at 1489.

By contrast, we have upheld the BIA's denial of an asylum application based on imputed political opinion where there was neither direct evidence of the persecutor's viewpoint, nor indirect evidence sufficient to compel a conclusion contrary to that reached by the BIA. In *Molina-Estrada*, for example, the BIA denied the alien's asylum claim because he failed to show persecution on account of a protected ground. *Molina-Estrada v. INS*, 293 F.3d 1089, 1094 (9th Cir. 2002). On appeal, the alien pointed to his testimony that guerillas had attacked his family's house in Guatemala and threatened members of his family because his father was a high ranking officer in the armed forces. *Id.* at 1092, 1094. Noting that the petitioner "offered no evidence that his father held particular political beliefs, that the guerillas knew of or assumed any such beliefs, or that they had made any statements suggesting that they attacked his father's home because of his father's political beliefs," *id.* at 1094–95, we concluded that petitioner's testimony was not enough to "compel any reasonable factfinder to conclude that Petitioner was subject to persecution because of imputed political beliefs." *Id.* at 1094 (internal quotation marks omitted).

As in *Molina-Estrada*, the record here does not compel the conclusion that the masked men imputed a political opinion to Garcia-Milian. First, there is no direct evidence that they did so. The masked men did not make any statements attributing political views to Garcia-Milian or indicating that they were retaliating against her due to the views of her ex-husband. Further, Garcia-Milian points to only a single piece of indirect evidence: the masked men's statement that they were looking for Noe Garcia because he had been in a guerilla group. In the circumstances of this case, however, this single statement sheds little light on the

masked men's motives for attacking Garcia-Milian: it does not establish whether the men imputed a political opinion to Garcia-Milian or merely wanted to extract information from her about Noe Garcia's whereabouts. If anything, the record raises a stronger inference that the masked men wanted information; they had been following Garcia-Milian for approximately three years and would have known that she no longer lived with or even associated with Noe Garcia. Unlike the victim in *Kebede*, therefore, Garcia-Milian failed to identify circumstantial evidence in the record raising a compelling inference that the masked men were imputing Noe Garcia's political opinions to her. For the same reason, the evidence in the record does not raise the inference that the men sought to punish Garcia-Milian for her association with Noe Garcia. Because Garcia-Milian's single piece of indirect evidence provides little or no support for her claim that she was persecuted for an imputed political opinion, it clearly does not *compel* that conclusion, and we must uphold the BIA's holding to the contrary.[3]

---

[3] In the circumstances of this case, the fact that Garcia-Milian had not associated with Noe Garcia in over a decade, and that the masked men had followed her long enough to learn this fact, weakens any inference that the masked men were retaliating against her because of her association with Garcia or that they imputed Garcia's political opinion to her. *Cf. Belayneh v. I.N.S.*, 213 F.3d 488, 491 (9th Cir. 2000) (holding that the record was "devoid of any suggestion that the alleged persecutors have imputed to [the petitioner] her former husband's views" in part because "the two have been divorced for more than fifteen years"). The dissent's argument that we should not consider this evidence because "[w]e simply do not know what [the masked men] knew or believed," Dis. op. at 21, merely underlines our point that there is no "compelling circumstantial evidence" of the masked men's motive, *Deloso v. Ashcroft*, 393 F.3d 858, 864 (9th Cir. 2005), and therefore we are not compelled to overturn the conclusion of the BIA. *See Molina-Estrada v. INS*, 293 F.3d at 1094.

Because Garcia-Milian did not present evidence of imputed political opinion that "would compel any reasonable factfinder to conclude that Petitioner was subject to persecution because of imputed political beliefs," *Molina-Estrada*, 293 F.3d at 1094 (internal quotation marks omitted), we conclude that substantial evidence supports the BIA's conclusion that Garcia-Milian was not persecuted "on account of" a protected ground. Accordingly, we reject Garcia-Milian's challenge to the BIA's denial of her asylum application.[4]

## B

We turn to Garcia-Milian's claim that the BIA erred in denying her CAT claim. To qualify for CAT relief, an alien must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2); *see also Nuru v. Gonzales*, 404 F.3d 1207, 1221 (9th Cir. 2005). Torture is "an extreme form of cruel and inhuman treatment," 8 C.F.R. § 208.18(a)(2), "that either (1) is not lawfully sanctioned by that country or (2) is lawfully sanctioned by that country, but defeats the object and purpose of CAT," *Nuru*, 404 F.3d at 1221. In addition, the torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Zheng v. Ashcroft*, 332 F.3d 1186, 1188 (9th Cir. 2003) (quoting 8 C.F.R. § 208.18(a)(1)) (emphasis and internal quotation

---

[4] For the same reasons, we reject Garcia-Milian's challenge to the BIA's denial of her claim for withholding of removal. An applicant who fails to satisfy the standard of proof for asylum also fails to satisfy the more stringent standard for withholding of removal. *Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003).

marks omitted).  "Thus relief under the Convention Against Torture requires a two part analysis—first, is it more likely than not that the alien will be tortured upon return to his homeland; and second, is there sufficient state action involved in that torture."  *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 351 (5th Cir. 2006).

In addressing the state-action prong of her CAT claim, Garcia-Milian points to her testimony that the police were unwilling to investigate the attack by the masked men which occurred before she left the country, implicitly arguing that because the police previously acquiesced in torture, the police are likely to acquiesce in future instances of torture.  *See Reyes-Sanchez v. Atty. Gen.*, 369 F.3d 1239, 1242 n.7 (11th Cir. 2004).  She has also submitted evidence that the Guatemalan government has been generally ineffective in preventing or investigating violence against women.  We must determine whether this evidence compels the conclusion that the Guatemalan government would acquiesce in torture if Garcia-Milian returned to Guatemala.

Public officials acquiesce in torture if, "prior to the activity constituting torture," the officials: (1) have awareness of the activity (or consciously close their eyes to the fact it is going on); and (2) breach their legal responsibility to intervene to prevent the activity because they are unable or unwilling to oppose it.  *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1059 (9th Cir. 2006) (quoting 8 C.F.R. § 208.18(a)(7)); *see also Cole v. Holder*, 659 F.3d 762, 771 (9th Cir. 2011).  By contrast, "[a] government does not acquiesce in the torture of its citizens merely because it is aware of torture but powerless to stop it." *Mouawad v. Gonzales*, 485 F.3d 405, 413 (8th Cir. 2007) (internal quotation marks omitted).

Evidence that the police were aware of a particular crime, but failed to bring the perpetrators to justice, is not in itself sufficient to establish acquiescence in the crime. Instead, there must be evidence that the police are unable or unwilling to oppose the crime. Otherwise, "a person could obtain CAT relief merely because he was attacked by a gang of neighborhood thugs whom the police were unable to apprehend." *Reyes–Sanchez*, 369 F.3d at 1243. In *Rreshpja v. Gonzales*, for example, the applicant claimed that the police had acquiesced in her attempted kidnaping because when she reported the crime, the police told her "that the information she had provided was insufficient to identify or arrest the man who had attacked her." 420 F.3d 551, 553 (6th Cir. 2005). The court upheld the BIA's denial of her CAT claim because the police's inability to solve a crime under those circumstances did not constitute acquiescence in the crime. *Id.* at 557. Similarly, in this case, Garcia-Milian's testimony that the police declined to investigate the masked men's attack because they lacked sufficient information does not compel the conclusion that the police acquiesced in the attack, and therefore does not support Garcia-Milian's claim that it is more likely than not the police will acquiesce in any future attacks if she returns to Guatemala.

Nor does evidence that a government has been generally ineffective in preventing or investigating criminal activities raise an inference that public officials are likely to acquiesce in torture, absent evidence of corruption or other inability or unwillingness to oppose criminal organizations. In *Tamara-Gomez*, for example, the court rejected the petitioner's claim that the Columbian government acquiesced in attacks by a narco-terrorist organization, even though the police informed the petitioner that it lacked the resources to protect individual families, and the record contained significant evidence that

the Columbian government was unable to prevent the terrorist group's crimes. 447 F.3d at 346. The court held that "neither the failure to apprehend the persons threatening the alien, nor the lack of financial resources to eradicate the threat or risk of torture constitute sufficient state action for purposes of the Convention Against Torture." *Id.* at 351. Similarly, in *Menjivar v. Gonzales*, the court rejected a petitioner's claim for CAT relief despite her evidence that she had been attacked by a gang member and the record included newspaper articles detailing the government's difficulty in controlling gangs. 416 F.3d 918, 922–23 (8th Cir. 2005). The court explained that "[t]he newspaper articles at most demonstrate that the government has a problem controlling gang activity of which it is aware," but such evidence did not compel a finding that the police acquiesced, or would acquiesce in the future, to gang members' criminal activities. *Id.* By contrast, evidence that police officials were corrupt, and worked on behalf of criminals or gangsters, may establish that the government has acquiesced in criminal activities. *See Madrigal v. Holder*, 716 F.3d 499, 510 (9th Cir. 2013) (holding that the petitioner had a plausible CAT claim based on the Mexican government's inability to control the Los Zetas drug cartel where "[v]oluminous evidence" showed "that corruption of public officials in Mexico remains a problem, particularly at the state and local levels of government, with police officers and prison guards frequently working directly on behalf of drug cartels"); *see also Ramirez-Peyro v. Holder*, 574 F.3d 893 (8th Cir. 2009) (holding that petitioner had a plausible CAT claim where the evidence showed "wide-scale police participation in harmful actions on behalf of" Mexican drug traffickers).

In this case, the record shows that the Guatemalan government and the police have taken steps to combat

violence against women including imposing hefty penalties for the crime of rape, establishing a Special Prosecutor for Crimes against Women, establishing a Special Unit for Sex Crimes, and prosecuting crimes against women. Even though, as a practical matter, these steps have not achieved the desired goals of resolving crimes and protecting citizens, they support the BIA's determination that the government is not wilfully blind to attacks on women in Guatemala. *See Tamara-Gomez*, 447 F.3d at 351; *Menjivar*, 416 F.3d at 923. Accordingly, the reports submitted by Garcia-Milian do not compel the conclusion that the Guatemalan government has acquiesced in torture against women, whether as a result of corruption or through cooperation with criminals. Therefore, substantial evidence supports the BIA's determination that Garcia-Milian has failed to establish the state action necessary for CAT relief.[5]

**PETITION FOR REVIEW DENIED.**

PAEZ, Circuit Judge, concurring in part and dissenting in part:

Although I agree with the majority that the Board of Immigration Appeals ("BIA") did not err in denying Garcia-Milian's CAT claim, I respectfully dissent from the majority's decision to deny her petition with respect to her claims for asylum and withholding of removal. In my view, the evidence in the record compels the conclusion that

---

[5] Because we decide on this basis, we do not address whether the record compels the conclusion that it would be more likely than not that Garcia-Milian would be tortured upon her return to Guatemala.

Garcia-Milian was attacked and raped because of her ex-husband's political opinions. I would therefore grant the petition and remand to the BIA for further proceedings on Garcia-Milian's asylum and withholding of removal claims.

I.

The majority effectively requires Garcia-Milian to produce direct evidence of the reasons for her persecution. First, the majority holds that the record "does not compel the conclusion that the masked men imputed a political opinion" to Garcia-Milian because the attackers "did not make any statements attributing political views to Garcia-Milian." Maj. Op. at 9. But we have never required asylum applicants to establish a nexus solely through direct evidence. To the contrary, an asylum applicant can establish a nexus between the act of persecution and the relevant political opinion by presenting "direct *or* circumstantial evidence" of her attackers' motivations. *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (emphasis added); *see also, e.g.*, *Deloso v. Ashcroft*, 393 F.3d 858, 864 (9th Cir. 2005) ("An applicant need not present direct evidence of a persecutor's motives if there is compelling circumstantial evidence."); *Gafoor v. I.N.S.*, 231 F.3d 645, 650 (9th Cir. 2000) ("Because it is so difficult to prove motives with any precision, the Supreme Court teaches that an applicant does not have to provide direct evidence that his persecutors were motivated by one of the protected grounds; instead, compelling circumstantial evidence is sufficient."), *superseded by statute on other grounds*, REAL ID Act of 2005, Pub. L. No. 109-13, div. B,

§ 101(h)(2), 119 Stat. 231, 305 (2005).**[1]**  Our case law thus requires us to look beyond the fact that the masked men did not directly *tell* Garcia-Milian they were attributing any political views to her, and consider whether the circumstantial evidence nevertheless compels the conclusion that they targeted her because of her association with her ex-husband. *See Silaya v. Mukasey*, 524 F.3d 1066, 1070–71 (9th Cir. 2008) ("[E]vidence that the alleged persecutor acted because of a petitioner's family's political associations is sufficient to satisfy the motive requirement." (internal quotation marks and alteration omitted)); *see also Zhang v. Gonzales*, 408 F.3d 1239, 1246 (9th Cir. 2005); *Kebede v. Ashcroft*, 366 F.3d 808, 812 (9th Cir. 2004).

The majority also provides a second, related reason for concluding that Garcia-Milian has failed to establish a nexus: her attackers did not "indicat[e] that they were retaliating against her due to the views of her ex-husband."  Maj. Op. at 9.  Here, again, the majority errs by requiring Garcia-Milian to provide direct evidence of motive.  We have explicitly held that an applicant is *not* required to present evidence of her

---

**[1]** We have recognized that compelling evidence of imputed political opinion may include, *inter alia*, the persecutor's "conduct or statements," *Navas v. I.N.S.*, 217 F.3d 646, 659 (9th Cir. 2000), "the timing and substance of the persecution," *Singh v. Gonzales*, 439 F.3d 1100, 1111 (9th Cir. 2006), the location of the persecution, *Donchev v. Mukasey*, 553 F.3d 1206, 1222 (9th Cir. 2009), "the applicant's association with, or relationship to, people who are known to hold a particular political opinion," *Navas*, 217 F.3d at 659, and "obvious signs connecting persecutory acts to the alleged persecutors and suggesting the alleged persecutors' motives," *Karouni v. Gonzales*, 399 F.3d 1163, 1174 (9th Cir. 2005) (internal quotation marks and alteration omitted).  "We have also found . . . persecution [on the basis of political opinion] when there is no other logical reason for the persecution." *Sangha v. I.N.S.*, 103 F.3d 1482, 1490 (9th Cir. 1997).

attackers' own stated reasons for attacking her. *Garcia-Martinez v. Ashcroft*, 371 F.3d 1066, 1075 (9th Cir. 2004) ("By seizing upon the soldiers' failure explicitly to state why they were raping Garcia, the IJ appeared to require that Garcia provide *direct* evidence of the soldiers' motive, when we have consistently allowed circumstantial evidence to suffice."). Indeed, in *Garcia-Martinez*, we held that it would be "patently unreasonable" to "rely solely upon . . . a persecutor's own statements regarding motive" when deciding if a nexus exists. *Id.* at 1076. Thus, we concluded, "the fact that the soldiers failed explicitly to inform Garcia that they were raping her on account of a protected ground [was] *not* highly relevant." *Id.*; *see also Gafoor*, 231 F.3d at 650 ("Persecutors do not always take the time to tell their victims all the reasons they are being beaten or kidnapped or killed.").

## II.

The majority next recites its duty to consider circumstantial evidence, but fails to actually do so. First, the majority states that the "single piece of indirect evidence" in the record is "the masked men's statement that they were looking for [Garcia-Milian's ex-husband] because he had been in a guerrilla group." Maj. Op. at 9. I disagree. The masked men's statement is not the "single" piece of indirect evidence in support of Garcia-Milian's claims. Consider the facts of the case: at 11:00 p.m., the masked men began "hitting the door very loudly," demanding that Garcia-Milian let them into her house. Thinking that they were the police, Garcia-Milian opened the door. The men entered and told Garcia-Milian they were looking for her ex-husband because he was a member of a guerrilla organization. The following events then occurred, as credibly described by Garcia-Milian:

> They asked me where my husband was, and I don't know where he is. I told them I didn't know because it had been more than 15 years since we were separated; that I didn't know anything about him. They said I did know. They took me inside, and they put a weapon on my chest, and they kept telling me to tell them, to tell them, and I said I didn't know anything. They insisted that . . . if I wouldn't tell them, they would kill me. After they threw me on the floor, and when I felt they were going to kill me, I mentioned a place, but I knew he wasn't there so they would leave and they wouldn't kill me. They began to hit me. After they hit me a lot, they kicked me very hard with their shoe. Then they raped me. One was holding a weapon on my head, and the other one was laughing. Then the other one raped me, began to rape me. I was unconscious. I couldn't take it any longer.

The record is thus replete with circumstantial evidence of motive beyond the attackers' own statements—namely, the record shows that the attackers knew who Garcia-Milian was, knew of her association with her ex-husband, knew where she lived, visited her at her private home late at night, and violently hit, kicked, and took turns raping Garcia-Milian—while laughing—over the course of an interrogation that focused on nothing *other* than information about her ex-husband, whom the attackers sought to find because of his political views.

This leads me to my ultimate point of disagreement: I fail to see how any reasonable fact-finder could conclude that the circumstantial evidence in this case "sheds little light" on why the masked men attacked Garcia-Milian, as the majority concludes. Maj. Op. at 9–10. To the contrary, I would hold that any reasonable fact-finder would be compelled to find that Garcia-Milian was personally targeted *because of* her ex-husband's political beliefs. *See Silaya*, 524 F.3d at 1070–72. Because "evidence that the alleged persecutor acted because of a petitioner's family's political associations is sufficient to satisfy the motive requirement," *id.* at 1070–71 (internal quotation marks and alteration omitted), and because Garcia-Milian has provided compelling circumstantial evidence of such a motive, I would further hold that Garcia-Milian has established the requisite nexus. *See Navas*, 217 F.3d at 659 n.18 ("Where police beat and threaten the spouse of a known dissident, it is logical, in the absence of evidence pointing to another motive, to conclude that they did so because of the spouse's presumed guilt by association.").

Finally, the majority claims that because the masked men had followed Garcia-Milian for several years, they "*would* have known that she no longer lived with or even associated with [her ex-husband]." Maj. Op. at 10 (emphasis added). This is both speculative and irrelevant. First, although Garcia-Milian testified that the masked men followed her "a lot," she never stated that they provided constant surveillance of her or her home. In fact, she did not testify to ever seeing them at her home until the night of the attack; she testified solely that the masked men had followed her while "shopping or going to school" and on the street. Thus, we have no idea to what extent the masked men knew who lived in or visited her home. This is particularly true in light of Garcia-Milian's testimony that her ex-husband traveled frequently for work

during the period they lived together—for all we know, the attackers might have thought that Garcia-Milian's ex-husband was merely traveling for long stretches of time, as he had in the past. We simply do not know what they knew or believed about Garcia-Milian's current relationship with her ex-husband.

Second, even if the masked men *did* know that Garcia-Milian no longer lived with her ex-husband, I fail to see how this carries any legal relevance: the attackers told Garcia-Milian that they had come to her home *because they were looking for her ex-husband*. Whether or not the majority thinks it made sense for the attackers to look for Garcia-Milian's ex-husband at her home years after he moved out, Garcia-Milian credibly testified that they did so. In the end, I do not see how the fact that the masked men may or may not have known that Garcia-Milian's ex-husband no longer lived with her carries any significance.

III.

For the above reasons, I would hold that the record compels the conclusion that Garcia-Milian was beaten and raped because of her ex-husband's political views, which satisfies the requirements for showing "imputed political opinion." I would therefore grant the petition with respect to Garcia-Milian's claims for asylum and withholding of removal and remand for further proceedings.