NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

JUN 3 2025

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| JERSON ABRAHAM SOTO, <br><br> Petitioner, <br><br> v. <br><br> PAMELA BONDI, Attorney General, <br><br> Respondent. | No. 24-2754 <br><br> Agency No. <br> A094-306-394 <br><br> MEMORANDUM* |

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted March 26, 2025**
Phoenix, Arizona

Before: GRABER, BERZON, and BENNETT, Circuit Judges.
Dissent by Judge BERZON.

Petitioner Jerson Abraham Soto is a native and citizen of El Salvador. He

timely seeks review of a decision of the Board of Immigration Appeals ("BIA"),

dismissing his appeal of an immigration judge's ("IJ") denial of relief under the

---

\* This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

\*\* The panel unanimously concludes this case is suitable for decision
without oral argument. See Fed. R. App. P. 34(a)(2).

Convention Against Torture ("CAT").  We have jurisdiction under 8 U.S.C.

§ 1252.  We review for substantial evidence a denial of CAT relief "and will

uphold a denial supported by reasonable, substantial, and probative evidence on the

record considered as a whole."  Yali Wang v. Sessions, 861 F.3d 1003, 1007 (9th

Cir. 2017) (citation and internal quotation marks omitted).  The agency's factual

findings are conclusive unless the evidence would compel every reasonable

adjudicator to find otherwise.  Munyuh v. Garland, 11 F.4th 750, 758 (9th Cir.

2021).

CAT relief is granted only when (1) it is "more likely than not that the alien

will be tortured upon return to his homeland" and (2) there is "sufficient state

action involved in that torture."  Garcia-Milian v. Holder, 755 F.3d 1026, 1033

(9th Cir. 2014) (citation and internal quotation marks omitted); see 8 C.F.R.

§ 1208.16(c)(3) (stating that adjudicators shall consider all relevant evidence,

including evidence of past torture, evidence that the applicant can relocate within

the country of removal to avoid torture, and evidence of human rights violations in

the country of removal).

Petitioner did not present evidence of past torture or of an individualized

inability to relocate within El Salvador to avoid harm.  Nonetheless, we assume,

without deciding, that he established a likelihood of torture by non-governmental

actors if he is returned to El Salvador and imprisoned.

With regard to governmental involvement, Petitioner provided only evidence of country conditions. Such evidence can be sufficient on its own to show that a petitioner is entitled to CAT relief. Aguilar-Ramos v. Holder, 594 F.3d 701, 705 (9th Cir. 2010). But here, the BIA determined that "the [IJ] permissibly relied on country conditions evidence" to find that the Salvadoran government's actions fell short of the "sufficient state action" prong. To satisfy that prong, Petitioner must show that he would face torture "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Garcia-Milian, 755 F.3d at 1033 (quoting Zheng v. Ashcroft, 332 F.3d 1186, 1188 (9th Cir. 2003)) (internal quotation marks omitted).

First, the BIA permissibly ruled that the country conditions evidence did not establish that Petitioner would, more likely than not, be subjected to torture by state actors. Although the country conditions evidence includes "credible reports that government officials employed [torture] at times," (emphasis added), that evidence alone does not meet the high burden of compelling every reasonable adjudicator to find that Petitioner would, more likely than not, face torture at the hands of government officials. For example, the record also shows that it is illegal for government officials to engage in torture and that the Salvadoran government has investigated claims of torture and has implemented annual training sessions to combat the use of torture.

Likewise, the country conditions evidence contains information that supports conflicting inferences concerning non-governmental actors. That evidence therefore does not compel us to overturn the BIA's determination that Petitioner failed to demonstrate that the Salvadoran government is likely to acquiesce in, or consent to, torture by private actors within Salvadoran prisons. Again, the use of torture is illegal, and the Salvadoran government has assigned ombudsmen to investigate claims of torture and of corruption. Although the record also contains evidence that the steps taken by the Salvadoran government have been <u>ineffective</u>, ineffectiveness is not the same as acquiescence. <u>See</u> <u>Garcia-Milian</u>, 755 F.3d at 1034 ("Nor does evidence that a government has been generally ineffective in preventing or investigating criminal activities raise an inference that public officials are likely to acquiesce in torture, absent evidence of corruption or other inability or unwillingness to oppose criminal organizations."). In sum, without additional evidence showing that the Salvadoran government's steps are willfully ineffective, the record does not compel us to hold that any reasonable adjudicator would find government acquiescence.

**PETITION DENIED.**

*Soto v. Bondi*
No. 24-2754

FILED

JUN 3 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

BERZON, Circuit Judge, dissenting:

To qualify for relief under the Convention Against Torture (CAT), Soto is required to show (1) it is "more likely than not that [he] will be tortured upon return" to El Salvador and (2) there is "sufficient state action involved in that torture." *Garcia-Milian v. Holder*, 755 F.3d 1026, 1033 (9th Cir. 2014) (quoting *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 351 (5th Cir. 2006)). In the unusual circumstances of this case, I would hold based on the country conditions evidence alone that the Board of Immigration Appeals' (BIA) denial of CAT relief was not supported by substantial evidence. *See Aguilar-Ramos v. Holder*, 594 F.3d 701, 705 (9th Cir. 2010).

The country conditions evidence, including a U.S. Department of State Country Report, describes the treatment of suspected gang members in El Salvador. Under El Salvador's ongoing "state of exception" Salvadoran "security forces [are] empowered to arrest anyone suspected of belonging to a gang or providing support to gangs." Salvadoran security forces have acted with "impunity," engaging in "arbitrary arrests" and "torture and cruel, inhuman, or degrading treatment or punishment." Over "52,000 persons were arrested in the first six months of the state of exception" alone.

1

Soto fits exactly the profile of those who have been arrested, detained, and tortured during the state of exception. According to the State Department report, Salvadoran news organizations and human rights groups have reported that "security forces frequently arrested persons for gang membership based solely on anonymous denunciations through a government hotline, for having tattoos, or for having any prior contact with the criminal justice system." An Amnesty International report submitted to the agency similarly states that some arrests under the state of exception have been "based solely on individuals having tattoos or a prior criminal record."[1] Soto stated at his reasonable fear interview that he is a former member of a street gang. He was convicted in 2012 of assault with a semiautomatic firearm and had his sentence enhanced because the assault was connected to his gang membership. Additionally, Soto has tattoos on his neck and arm that visibly signal his prior gang affiliation.

Soto did not provide any evidence beyond the country conditions evidence and his own testimony, which the immigration judge (IJ) found to be credible, to support his claim for CAT relief. But an applicant for CAT relief "may satisfy his

---

[1] El Salvador is not alone in using tattoos to identify suspected gang members: the U.S. government currently treats tattoos as an indicator of gang affiliation in determining whether to deport individuals to the very jails in which Soto fears he will be incarcerated. *See Trump v. J.G.G.*, No. 24-931, 2025 WL 1024097, at \*4 (Apr. 7, 2025) (Sotomayor, J., dissenting); *see also* Plaintiffs' Motion for Preliminary Injunction, Exhibit S at 8, *J.G.G. v. Trump*, No. 25-766 (D.D.C. Mar. 28, 2025), ECF No. 67-21.

burden with evidence of country conditions alone." *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705 (9th Cir. 2010). And "the CAT regulations cast a wide evidentiary net, providing that 'all evidence relevant to the possibility of future torture shall be considered, including, but not limited to . . . evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable, and other relevant information regarding conditions in the country of removal.'" *Wakkary v. Holder*, 558 F.3d 1049, 1068 (9th Cir. 2009) (quoting 8 C.F.R. § 1208.16(c)(3)(iii)-(iv)). Given that command, "[w]idespread mistreatment" of a group to which a CAT applicant belongs "may well be relevant to an applicant's claim that he faces a clear probability of torture upon return." *Id.* at 1068.

Here, the country conditions evidence demonstrates that a discrete group of people, suspected gang members, are, in extremely large numbers, subject to widespread mistreatment by the Salvadoran government. True, torture is at least formally illegal in El Salvador. And, although arbitrary arrests and imprisonment are widespread under the state of exception, those actions alone do not amount to torture under the CAT. *See Guo v. Sessions*, 897 F.3d 1208, 1217 (9th Cir. 2018). But the State Department report describes acts of torture against those arrested, as well as reports that "the government or its agents committed arbitrary or unlawful killings, largely stemming from deaths of detainees while in prison during the state of exception."

3

Further, "within broad groups subject to some degree of hostile treatment, subgroups may exist whose members face an even greater or more particularized threat of [torture]." *Kotasz v. INS*, 31 F.3d 847, 854 (9th Cir. 1994). Members of such subgroups "have a correspondingly lesser burden of showing individualized targeting." *Id.* In *Kotasz*, we applied that reasoning in holding that the asylum petitioner there, an anti-communist from Hungary, faced an even greater risk of persecution than other Hungarian anti-communists because he was "part of the subgroup of anti-communists who were *active* opponents of the Communist regime." *Id.*

Here, Soto is not only a member of the broader disfavored group of suspected gang members but also a member of the subgroup of such individuals who bear gang-related tattoos. The country conditions evidence describes how Salvadoran security forces use tattoos to identify suspected gang members for imprisonment. Just as attending anti-communist demonstrations increased the petitioner's personal risk of persecution in *Kotasz*, Soto's gang tattoos mark him as a target for imprisonment and torture.

The BIA considered Soto's country conditions evidence, noting that it included evidence of "Salvadoran authorities targeting deportees and suspected gang members, including those with tattoos." The agency mischaracterized that evidence, stating that there were "instances" of such targeting; in fact, the State

4

Department report states that over 52,000 such people were arrested in six months alone, out of a population of 6.6 million.

Further, the IJ's specific finding on acquiescence by the El Salvador government in torture, which the BIA affirmed, is also not supported by substantial evidence. The record contradicts that finding. The State Department report describes how Salvadoran security forces have themselves engaged in "torture and cruel, inhuman, or degrading treatment or punishment" under the state of exception. The report also states that there are "credible reports" that police and prison guards "employed [torture] at times." Further, the report describes prisoner deaths resulting from "strangulation, blunt force trauma, or other causes that could indicate torture or mistreatment while in detention," as well as reports from individuals who were released from Salvadoran prisons that "guards regularly beat detainees." In addition, the Amnesty International report documents cases of "torture by gang members, including beatings, lynchings and constant threats, which prison officials did not attempt to prevent." The State Department report explains that although Salvadoran "law provides criminal penalties for corruption by officials[,] . . . allegations of corruption and impunity persist[]," and that, despite receiving over 400 complaints of abuses during the first five months of the state of exception, the Salvadoran Human Rights Ombudsman's Office "did not visit prisons to verify prison conditions or prisoner treatment until 107 days after

the start of the state of exception." At the time of publication of the State Department report, the Ombudsman's Office had again been denied access to prisons.

In sum, the agency failed to grapple with whether the country conditions evidence in combination with Soto's unique characteristics demonstrates that his likelihood of arrest and torture is extremely high. Even though he is not by name on the Salvadoran government's radar screen at present, everyone like him is a sought-out target. That showing demonstrates Soto's individualized, more-likely-than-not risk of torture. In light of the record, the agency's finding that Soto did not face a risk of torture by or with the acquiescence of the Salvadoran government was simply not supported by substantial evidence.[2] I therefore respectfully dissent.

---

[2] I note that recent litigation supports the conclusion that suspected gang members deported to El Salvador face an extreme risk of state-sponsored torture in that nation's prisons. *See, e.g.*, *Abrego Garcia v. Noem*, No. 8:25-CV-00951-PX, 2025 WL 1014261, at *11 (D. Md. Apr. 6, 2025).