# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1226

_____

Israel Felipe Lira Saldana; Elizabeth Pino Peralta; Matilda Isabel Lira Pino; Israel Felipe Lira Pino; Karla Elizabeth Godinez Pino,

*Petitioners*,

v.

Loretta E. Lynch, U.S. Attorney General,

*Respondent*.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: October 22, 2015
Filed: April 28, 2016

_____

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Israel Felipe Lira Saldana, his wife, Elizabeth Pino Peralta, and their children, Matilda, Israel, and Karla, petition for review of a decision of the Board of Immigration Appeals denying their applications for asylum, withholding of removal, and relief under the Convention Against Torture. We conclude that the Board's

decision was supported by substantial evidence, and we therefore deny the petition for review.

I.

The petitioners are natives and citizens of Mexico. They entered the United States in August 2011 and applied for asylum, withholding of removal, and relief under the Convention against Torture. The petitioners contend that members of the Matazetas gang in Mexico will persecute them if they are returned to Mexico, because the Matazetas believe that Elizabeth and her sister, Angelica Pino Peralta, were romantically involved with members of a rival criminal organization known as Los Zetas. In terms of the governing statutes, the petitioners asserts that the Matazetas will persecute them based on their membership in a particular social group, and that the Mexican government is unwilling or unable to control the Matazetas. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1).

At a hearing before an immigration judge, daughter Karla testified concerning an incident that occurred in August 2011, in the state of Veracruz, while she resided at the home of Elizabeth's mother with Angelica, Angelica's four children, and Elizabeth's brother. According to Karla, masked men armed with weapons entered the house, assaulted Karla's uncle, and asked where to find Angelica and "Chula," a nickname used by Elizabeth. The men mentioned former boyfriends of Angelica who were members of the Zetas gang and sought information about the Zetas from the women. The men threatened to rape and torture Angelica and Elizabeth when they found them. According to Karla, the intruders took a seven-year-old son of Angelica's outside for "interrogation" and influenced him to tell a "commander" that Elizabeth had dated a member of the Zetas. After this incident, Angelica (who had been hiding in the home) and Karla fled the area and eventually traveled to the United States. But the armed men returned later and abducted Karla's uncle and grandmother, who remain missing.

-2-

When Elizabeth learned about the home invasion, she fled the country with Israel and the other two children. Israel testified that he believed the family was being targeted because of Angelica's romantic relationship with a member of Los Zetas. He said that a friend in Veracruz had called him after the family departed and said that unidentified men had said they would kill anyone found in the petitioners' home. Elizabeth reported hearing later from a friend in Mexico that she should "not come back because they're still looking for you."

The petitioners' expert witness, Dr. Thomas Boerman, testified that drug-trafficking organizations are engaged in criminal activity throughout most of Mexico. He explained that the Matazetas claim "to be essentially nationalistic protectors of the state of Veracruz and its population." He opined in a declaration that the Mexican government "is essentially powerless to contain" criminal organizations, and that "once targeted, the gravity of the threat toward an individual does not diminish across time."

The immigration judge credited the testimony of the petitioners and Dr. Boerman, but rejected the claims for asylum and withholding of removal on multiple grounds. The Board affirmed the decision. The Board concluded that the petitioners had not identified a particular social group that warranted protection under the statute, because "the record does not sufficiently reflect that Mexican society would perceive family members of someone who dated gang members as sufficiently separate or distinct."

The Board also found that the petitioners were not eligible for relief because the source of the alleged harm was not the Mexican government or a group that the government was unwilling or unable to control. The Board observed that Elizabeth's grandmother filed a police report about the home invasion, that the police continued to investigate the incident, and that the government was "making attempts to control criminals and drug traffickers." The Board ruled alternatively that it was reasonable

-3-

for the family to relocate within Mexico, because Dr. Boerman's testimony did not establish that the Matazetas were a threat outside of Veracruz. Like the immigration judge, the Board rejected the family's claim for relief under the Convention against Torture because they did not establish that the Mexican government would acquiesce in torture.

We review the Board's decision for substantial evidence on the record as a whole, *Menendez-Donis v. Ashcroft*, 360 F.3d 915, 918 (8th Cir. 2004), and cannot disturb its findings of fact "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1, 483-84 (1992). Where the Board adopted the reasoning of the immigration judge, we consider the two decisions together. *Falaja v. Gonzales*, 418 F.3d 889, 894 (8th Cir. 2005).

II.

The Attorney General may grant asylum to aliens who are unwilling to return to their home country because of persecution or a well-founded fear of persecution on account of "membership in a particular social group." *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1). The petitioners argue that the Board erred by considering the wrong proffered social group. They also challenge the Board's alternative reasons for rejecting their claims for relief.

The petitioners contend that they are members of a "particular social group" defined as the Lira-Pino family, which consists of twelve persons related to Elizabeth who lived in two households in Veracruz. One household includes the adult petitioners and two of the children; the other household consists of the third child, Karla, and the seven other relatives with whom she resided. The petitioners assert that "family" is an established particular social group under the asylum statute, and that the Board erred in ruling that they failed to allege persecution based on a protected

ground. The government responds that while the petitioners did say during the administrative process that their proposed social group was "family," they also defined the group as "relatives of a person who had a romantic relationship with a gang member," and that the Board properly rejected a claim based on that proposed social group.

The definition of the proffered particular social group in this case has been something of a moving target. In oral argument before the immigration judge, counsel for petitioners referred to a particular social group as "family" or "family members." A.R. 276, 327, 524. Counsel also explained that the social group was based on familial relationship to Angelica, who experienced an "actual romantic relationship with two members of the Zetas," and to Elizabeth, who had a "perceived relationship with a Zeta." A.R. 526. The immigration judge understood the claimed social group to be "family members of Angelica who dated several Zeta members" or "family members of women who date gang members." A.R. 231-32.

In their notice of appeal to the Board, the petitioners claimed a fear of persecution based on membership in a particular social group defined as "the Peralta family's kinship with a family member who is an imputed associate of Los Zetas gang and persecuted by a rival gang, the Matazetas." A.R. 168. In their brief to the Board, the petitioners argued that the immigration judge erred by defining the particular social group as "family members of women who date gang members," and urged that the particular social group claimed was instead "the Pino family," which they defined as the two adults and three children who are petitioners in this appeal. A.R. 117-18. The Board's decision then addressed the proposed social group of "family members of someone who dated gang members." In their brief to this court, the petitioners assert that the Board was mistaken, and that the proposed social group is the "Lira-Pino family," which they now define to include not only the five petitioners, but rather the two "households" and twelve persons described above.

As the government appears to acknowledge, a fair reading of the record shows that the petitioners did proffer to the Board their own specific "family" as a particular social group underlying their claim for asylum. The Board, however, ruled only that the group described as "family members of someone who dated gang members" was not sufficiently separate or distinct to qualify as a particular social group under the statute.

We cannot tell whether the Board, in rejecting the proposed social group that it described, meant to reject the petitioners' specific family as well. Given petitioners' contention that the Matazetas planned to kill all family and friends associated with the Zetas, A.R. 95, a decision including one family of a friend of the Zetas as a protected social group logically might require including all families of all friends of the Zetas. The Board elsewhere has rejected "family members" as a proposed social group when threats affect members of numerous families in a society, as opposed to one family uniquely, *see Matter of S-E-G-*, 24 I. & N. Dec. 579, 585 & n.2 (B.I.A. 2008), but the Board did not articulate that rationale here. We do not know whether the Board rejected petitioners' family as a particular social group because it was part of a broader group of families that the Board considered too diffuse or amorphous to qualify, or whether the Board simply failed to analyze the right question.

The Supreme Court has emphasized that the decision whether a family constitutes a "particular social group" is a matter that should be decided by the Board in the first instance. *Gonzales v. Thomas*, 547 U.S. 183, 186-87 (2006) (per curiam). The Board did not address the point directly in this case, and we thus cannot resolve whether the petitioners have identified a particular social group under the statute.

The government contends, however, that if the Board should have considered petitioners' family as the proposed social group, then the Board's ruling should be upheld on alternative grounds. The Board ruled that petitioners were ineligible for relief because they cited fear of persecution by private actors, not the Mexican

government, and did not show that the government was unwilling or unable to control the private actors. The Board also concluded that it was reasonable for petitioners to relocate to a different part of Mexico to avoid the feared harm. To prevail, the petitioners must show that no reasonable adjudicator could have reached those conclusions.

These alternative grounds concern whether the petitioners established a well-founded fear of "persecution" within the meaning of the asylum statute. Persecution is harm inflicted either by the government or by persons or an organization that the government is unwilling or unable to control. *Valioukevitch v. INS*, 251 F.3d 747, 749 (8th Cir. 2001). To establish persecution based on the conduct of private actors, an applicant must show that the government either condones the conduct or is unable to protect the victims. *Menjivar v. Gonzales*, 416 F.3d 918, 921 (8th Cir. 2005). Neither difficulty controlling private behavior nor failure to solve every crime or to act on every report is sufficient to meet the standard. *Id.*; *see De Castro-Gutierrez v. Holder*, 713 F.3d 375, 381 (8th Cir. 2013); *Salman v. Holder*, 687 F.3d 991, 994-95 (8th Cir. 2012); *Suprun v. Gonzales*, 442 F.3d 1078, 1081 (8th Cir. 2006); *Hasalla v. Ashcroft*, 367 F.3d 799, 804 (8th Cir. 2004). Whether a government is "unable" to control a private actor such that non-governmental actions constitute persecution "is a factual question that must be resolved based on the record in each case." *Menjivar*, 416 F.3d at 921. Even where an alien shows a well-founded fear of persecution upon return to his place of origin, moreover, the government can defeat a claim for asylum by showing that the alien reasonably can relocate within his home country to avoid persecution. 8 C.F.R. § 208.13(b)(2)(ii), (b)(3).

Petitioners contend that the Mexican government is unwilling or unable to control the Matazetas gang. They cite the fact that police in Veracruz have not solved the home invasion or the abduction of two relatives, and that police in the state of Puebla declined to take action when petitioner Lira Saldana reported the crimes. These facts are insufficient to compel a conclusion in favor of petitioners. Petitioners

and their relatives did not report the home invasion or abductions to authorities in Veracruz until one to two months after the incidents, A.R. 376, yet petitioners acknowledged that police acted on their complaint and continued to investigate the matter. A.R. 378-79. That police in Veracruz could not solve a crime committed by masked men and reported well after the fact does not dictate a finding that the government is unable to control persecution by the gang. Nor does the decision of police in the state of Puebla to refer Lira Saldana back to police in the state of Veracruz, A.R. 451, compel a finding of unwillingness or inability to control. The offenses were committed in Veracruz, and the Board reasonably could determine that police in Puebla simply directed petitioner to the correct jurisdiction.

Petitioners rely on the testimony of their expert to demonstrate an inability of the Mexican government to control the Matazetas. Dr. Boerman testified that "when you've got the kind of uncontrolled carnage that you see going on in Mexico," it is "clear that the government simply doesn't have the capacity and/or [the] will" to control criminal gangs. A.R. 494. According to Boerman, Mexico's security minister recently acknowledged that "40 percent of the country is really no longer under government control," and that "when it comes to public security and the capacity to contain and control these groups who have essentially usurped the state in many respects . . . , it's becoming more clear that there's questions about whether Mexico is any longer a functioning state." A.R. 495-96.

The government responds with evidence that the Mexican government has dedicated substantial resources to controlling criminal organizations. More than 3,000 federal police officers were fired in August 2010 in an effort to purge official corruption. A.R. 1050. In reaction to the Matazetas, after petitioners left the country, the Mexican government deployed federal police and military troops to Veracruz, A.R. 577, 1020, and reported a significant drop in violence in that area. A.R. 577. This is not to say that the Mexican government has eliminated criminal gangs or that there is no difficulty in controlling these organizations. But a government that is

"unable" to control criminal activity cannot mean anything and everything short of a crime-free society; the standard is more akin to a government that has demonstrated "complete helplessness" to protect victims of private violence. *E.g.*, *Salman*, 687 F.3d at 995; *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000). Inability to control private actors is an imprecise concept that leaves room for discretion by the agency. Given the documented efforts of the Mexican government to combat the private violence at issue here, we are not prepared to say that no reasonable adjudicator could reach the Board's conclusion. *See De Castro-Gutierrez*, 713 F.3d at 381 (rejecting claim that Colombian government was unable to control violence inflicted by the Revolutionary Armed Forces of Colombia).

Important, too, is the Board's conclusion that it was reasonable for petitioners to relocate within Mexico to avoid a threat of persecution by the Matazetas. Veracruz is the locus of gang activity perpetrated by the Zetas and Matazetas. Dr. Boerman, the petitioners' expert, characterized the Matazetas as a gang whose role was "to clean the state of Veracruz from the scourge of the Zetas." A.R. 496-97. Boerman testified that the activity of the Matazetas was "concentrate[d] in the state of Veracruz," and he did not have "any information about their activity out of Veracruz." A.R. 512. Although Boerman adverted to the potential that 40 to 50 percent of Mexico is no longer under government control, the implication of course is that 50 to 60 percent *is* under government control, and Boerman himself suggested that the government has more control in Mexico City (some 240 miles from Veracruz) and in the states of Oaxaca and Puebla. A.R. 495, 521-22. This evidence supported the Board's conclusion that internal relocation was reasonable and could avoid persecution of petitioners.[*]

_____

[*]The dissent refers to evidence that a Mexican government official advised petitioners to "get out of there immediately," and construes the evidence to mean that petitioners "were 'under a big risk'" and should "leave the country for their safety." This hearsay evidence concerned a telephone call placed by petitioner Lira Saldana's father to "a person who works in the government" while petitioner was still in the state of Veracruz at the city of Xalapa. A.R. 444, 457-58. According to petitioner Lira

-9-

The petitioners cite Boerman's opinion that relocation would not be viable as a safe strategy for repatriation in the long term. A.R. 504-05. Boerman's opinion was based in part on an assumption that Matazeta gang members had tracked the petitioners to a point near the United States border and threatened them in an anonymous telephone call to people who were housing petitioners. A.R. 362. The immigration judge and the Board, however, reasonably found that the vague hearsay evidence concerning this telephone call was insufficient to show that relocation was unlikely to avoid persecution. Boerman also relied on the "intelligence capacity of these kinds of organizations," and an assumption that "corrupt officials" would transmit data about petitioners to the Matazetas. A.R. 505. But on cross-examination, Boerman admitted that he did not have specific knowledge about connections between the Matazetas and government officials, and said that little was known about the specifics of their possible affiliation with other criminal organizations. A.R. 510-12. We are not convinced that the evidence concerning risks to the petitioners in locations outside Veracruz was so strong that it compelled a grant of relief by any reasonable adjudicator.

Because the Board permissibly rejected the petitioners' claim for asylum, it follows that petitioners did not meet the  higher standard of proof for withholding of

Saldana, the government employee told petitioner's father that they "could be under a big risk" and "the best thing" to do was to "get out of there immediately." A.R. 444. This evidence does not compel a conclusion that it would be unreasonable for petitioners to relocate within Mexico if they left the state of Veracruz.

The immigration judge's finding that petitioner's brother-in-law has not suffered harm because he is "kind of in hiding away from Veracruz" is not inconsistent with the Board's finding that petitioners reasonably could relocate safely within Mexico if they are away from Veracruz. Elizabeth testified that her brother was "kind of hiding far away," and when asked if he was "hiding," she said, "Yes. Like, like away from Veracruz." A.R. 371. Given that Elizabeth said the brother "works in construction, like placing electric cables for lighting – lighting or in construction on the roads," *id*., the Board reasonably could understand the testimony to equate "kind of hiding" with living away from Veracruz.

removal. *Ismail v. Ashcroft*, 396 F.3d 970, 975 (8th Cir. 2005). Substantial evidence also supports the Board's denial of relief under the Convention Against Torture. The Convention provides for relief if it is more likely than not that the petitioners would be subjected to torture if returned to Mexico, 8 C.F.R. § 208.16(c)(2), and that such torture would be inflicted "with the consent or acquiescence of a public official." 8 C.F.R. § 208.18(a)(1). "Acquiescence" requires prior awareness of the torture and breach of a legal responsibility to intervene. 8 C.F.R. § 208.18(a)(7); *Garcia v. Holder*, 746 F.3d 869, 873-74 (8th Cir. 2014). Evidence concerning the Mexican government's efforts to combat criminal organizations in Veracruz and elsewhere was sufficient to support the Board's finding that the government was not likely to acquiesce in any torture by the Matazetas.

\* \* \*

For these reasons, the petition for review is denied.

MURPHY, Circuit Judge, dissenting.

The record indicates that Mexican authorities may be "unwilling and unable to control" the Matazetas gang. See Menjivar v. Gonzales, 416 F.3d 918, 921 (8th Cir. 2005) (asylum applicant must show government unwilling or unable to control nongovernmental persecutors). Although one online news article reported that the Mexican government had deployed police and troops to Veracruz to combat violence by the Matazetas, the same article stated that a one month reduced murder rate in 2012 may have been a mere "blip" since "it's not uncommon for a couple of relative calm months to interrupt an area's ongoing descent." The record also includes petitioner Israel's testimony before the immigration judge that while he and his family were hiding in Xalapa, a city about 100 kilometers from their home in Veracruz, a Mexican government employee had advised his father that petitioners should "get out of there immediately" because they were "under a big risk."

-11-

This record does not demonstrate that internal relocation in Mexico presents a "reasonable" alternative for petitioners.  See Hagi-Salad v. Ashcroft, 359 F.3d 1044, 1047–49 (8th Cir. 2004) (explaining that relocation must be reasonable under 8 C.F.R. § 208.13(b)(3)).  There is evidence here that a Mexican official advised petitioners to leave the country for their safety.  The immigration judge also found Israel's testimony credible that the only reason his brother in law had not suffered harm in Mexico was "because he is kind of in hiding."  If petitioners were to attempt to relocate in Mexico, they may have to hide to avoid persecution like the brother in law experienced.  See N.L.A. v. Holder, 744 F.3d 425, 442 (7th Cir. 2014) (petitioner could not safely relocate since the reason her sister remained safe in Colombia was because she lived in hiding, and "[i]t is an error of law to assume that an applicant cannot be entitled to asylum if she has demonstrated the ability to escape persecution . . . by trying to remain undetected"); Essohou v. Gonzales, 471 F.3d 518, 522 (4th Cir. 2006) (time spent hiding in a village did not support the board's finding that the applicant could reasonably relocate internally in Congo).

For these reasons I dissent.  The petition for review should be granted and the petitioners' asylum claim should be remanded for full consideration.

_____