# United States Court of Appeals
### for the Eighth Circuit

_____

No. 15-3149

_____

Maria Dolores Fuentes-Erazo; Gerardo Yosimar Fuentes-Erazo

*Petitioner*s

v.

Jeff B. Sessions, Attorney General of the United States[1]

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: October 20, 2016
Filed: February 16, 2017

_____

Before WOLLMAN, SMITH, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

_____

[1]Jeff B. Sessions is automatically substituted pursuant to Federal Rule of Appellate Procedure 43(c)(2).

Maria Dolores Fuentes-Erazo and her minor son Gerardo Yosimar Fuentes-Erazo,[2] each a native and citizen of Honduras, petition for review of an order of the Board of Immigration Appeals (BIA) dismissing their appeal from an immigration judge's (IJ) decision to deny their applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). We deny the petition for review.

Fuentes and her infant son entered the United States without admission or parole on June 14, 2014, near Hidalgo, Texas, and were immediately apprehended by Department of Homeland Security (DHS) agents. After DHS initiated removal proceedings, Fuentes conceded that she and her son were removable, and she applied for asylum, withholding of removal, and relief under the CAT. She asserted that she had been abused in the past by Elvis Santos, her former domestic partner, and that she feared future abuse by Santos if she were forced to return to Honduras.

At a hearing before the IJ, Fuentes testified that she began a relationship with Elvis Santos when she was in her mid-teens. When she was about sixteen years old, she left her family home in the village of Tontolar and went to live with Santos in the village of Callejones, about an hour's walk away. She became pregnant shortly thereafter and eventually gave birth to her first son, Oslis. She testified that Santos was initially "really good, very kind," but that he began to mistreat her when he learned that she was pregnant. Santos denied paternity and began a pattern of psychological, physical, and sexual abuse, isolating Fuentes from other people, forbidding her from working, striking her with his hands and other objects, kicking her, threatening her with a knife and a gun, and raping her. The physical and sexual abuse occurred several times a month, often after Santos had been drinking. Fuentes stated that she did not report the abuse to police because the nearest police station

---

[2]Gerardo Fuentes-Erazo was included as a derivative claimant on his mother's applications for relief.

was a three-hour drive away in San Marcos, because it was uncommon for people in her village to report things to the police, and because she was afraid that Santos would take "revenge" on her if she reported him. She also did not seek medical treatment for any injuries Santos caused her.

Fuentes attempted to leave Santos, once by hiding in some trees for several hours, once by hiding at Santos's sister's house for several hours, and once by hiding at a neighbor's home for several hours, but she eventually returned home on her own each time. In 2009, however, she left Santos for good, taking Oslis and traveling to her sister's house in Santa Barbara, which was five or six hours away by bus. The two lived with Fuentes's sister in Santa Barbara for a year and a half. Although Fuentes heard that Santos was asking about her, he did not contact her in Santa Barbara, because she "didn't tell anybody," including her family, where she was.

Fuentes and Oslis left Santa Barbara and moved to the town of San Marcos, about three hours by bus from Santos's Callejones home, so that Fuentes could work. At Fuentes's request, her parents came to San Marcos and took nine-year-old Oslis back to Tontolar to live with them, where he continues to reside. Despite his proximity to Oslis, Santos has never called or visited him while Oslis has been living with Fuentes's parents. Meanwhile, Fuentes lived in and cleaned a house in San Marcos for "about a year and a half," after which she worked in a restaurant for roughly eleven months, where patrons told her that Santos had been looking for her. Fuentes met a man named Luis at the restaurant and began a relationship with him in 2013 that resulted in a second pregnancy. Fuentes stated that she did not feel safe in San Marcos because she "was closer" to Santos, but she also stated that Santos did not contact her in San Marcos and did not know that she was there.

Fuentes eventually left San Marcos and moved to San Pedro, a town approximately seven hours by bus from Santos's Callejones home. She lived in and cleaned a house in San Pedro for several months until she gave birth to her second

son, Gerardo, in September 2013. Santos did not contact Fuentes by phone or in person while she was living in San Pedro. Fuentes then returned to her sister's house in Santa Barbara, where she stayed until Gerardo was about six months old. Thereafter, she moved back to San Marcos at the invitation of Margarita Reyes, a family friend or "godmother," who helped Fuentes secure the cleaning and restaurant jobs she previously held in San Marcos. Fuentes stated that Santos learned about this time that she had had a son with another man, leading her to fear that Santos would kill her and Gerardo "out of jealousy." About one month after returning to San Marcos, Fuentes used money provided by Reyes to travel to the United States, which, as earlier stated, she entered from Mexico on June 14, 2014.

Fuentes testified that there was nowhere she could live in Honduras if she returned to that country because she did not "have a place to go," and did not "know anybody over there." She stated that she could not live with her parents, because they lived near Santos. She testified that she would not be able to work in a restaurant or as a house cleaner because she had to take care of her children. She also did not believe that she could support her children financially or that anyone else could care for them while she worked, explaining that her mother was ill and her father was too old. She did not believe that she could live with any of her six siblings or another family member. She stated that although Reyes had helped her obtain employment in Honduras in the past, she likely could not provide such help in the future because she had her own job. Although Fuentes "never saw [Santos] again" after she left him in 2009 and managed to avoid him for almost five years before she left Honduras, she stated that she did not think she could avoid him if she returned to Honduras because she had heard Santos was looking for her and that he had since acquired a vehicle and could now travel around Honduras to find her.

The IJ denied relief, concluding that even if Fuentes had established that she suffered past persecution, she had not demonstrated that the harm she suffered was on account of her membership in her proposed particular social group, composed of

-4-

"Honduran women in domestic relationships who are unable to leave their relationships." The IJ acknowledged Fuentes's abusive relationship with Santos, but noted that Fuentes did in fact "leave that relationship and reside[] in Honduras for approximately five years" thereafter, during which she entered into a relationship with and had a child by another man. Noting also that Fuentes "moved freely to different locations, had employment," and "had no contact voluntarily or not with [Santos after] she left him in 2009," the IJ concluded that Fuentes had failed to demonstrate her membership in her proposed social group and thus had failed to establish the requisite nexus between any abuse she had suffered and a protected ground. The IJ also concluded that Fuentes had failed to demonstrate that the Honduran government was unable or unwilling to protect her from harm inflicted by Santos. Acknowledging that the documentary evidence "suggests a lot of difficulty on the part of the government in addressing the problems of domestic violence in Honduras," the IJ noted that the government was "not helpless," and further noted that Fuentes "never gave the government an opportunity to try to protect her" because she "never called the police." Finally, the IJ observed that Fuentes "successfully avoided [Santos] for five years after she left him," that Santos "had no interest in locating" her, and thus that she would be able to relocate within Honduras if she were returned. The IJ denied Fuentes's application for asylum and, because she "failed to meet the lower burden for asylum," also denied withholding of removal. The IJ also denied relief under the CAT, citing a "dearth of evidence" regarding torture by, or with the acquiescence of, the Honduran government. The BIA dismissed Fuentes's subsequent appeal, finding "no clear error of fact or mistake of law" in the IJ's decision to deny all forms of relief.

We review the BIA's decision for substantial evidence on the record as a whole and will uphold its factual findings unless the petitioner "demonstrates that the evidence he presented not only supports a contrary conclusion but *compels* it." Ngugi v. Lynch, 826 F.3d 1132, 1136 (8th Cir. 2016) (citation omitted); see also 8 U.S.C. § 1252(b)(4)(B) (stating that findings of fact cannot be disturbed "unless any

reasonable adjudicator would be compelled to conclude to the contrary"). We review the BIA's legal determinations *de novo*, giving due deference to the BIA's interpretation of the statutes and regulations it administers. Salman v. Holder, 687 F.3d 991, 994 (8th Cir. 2012). To the extent the BIA adopted the findings or reasoning of the IJ, we consider the two decisions together. Garcia v. Holder, 746 F.3d 869, 872 (8th Cir. 2014).

To qualify for asylum, Fuentes bears the burden of demonstrating that she is a "refugee," who is unable or unwilling to return to Honduras because of past persecution or a well-founded fear of future persecution on account of her "membership in a particular social group." See 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1). To qualify for withholding of removal, Fuentes bears the even higher burden of demonstrating a "clear probability" that she will be persecuted on account of her membership in a particular social group. See Khrystotodorov v. Mukasey, 551 F.3d 775, 781 (8th Cir. 2008) (noting "more stringent" standard of proof for withholding of removal). To qualify for CAT relief, Fuentes must establish that it is more likely than not that she would be subjected to torture "with the consent or acquiescence of a public official" if returned to Honduras, 8 C.F.R. § 208.18(a)(1), a generally "more onerous" standard than that for asylum or withholding of removal, Khrystotodorov, 551 F.3d at 782. "'Acquiescence' requires prior awareness of the torture and breach of a legal responsibility to intervene." Saldana v. Lynch, 820 F.3d 970, 978 (8th Cir. 2016). "A government's 'willful blindness toward the torture of citizens by third parties' amounts to unlawful acquiescence." Khrystotodorov, 551 F.3d at 782 (quoting Mouawad v. Gonzales, 485 F.3d 405, 413 (8th Cir. 2007)). Whether a government acquiesces in torture inflicted by a private actor is a question of fact that must be resolved based on the record as a whole. See Saldana 820 F.3d at 978.

Substantial evidence supports the BIA's determination that Fuentes failed to establish that she was or will be persecuted on account of a protected ground. See

Gonzales v. Thomas, 547 U.S. 183, 186 (2006) (per curiam) (noting that whether a petitioner is a member of a particular social group "requires determining the facts and deciding whether the facts as found fall within [the] statutory term"). To be eligible for asylum or withholding of removal on the basis of her membership in a particular social group, Fuentes was required to establish that she is actually a member of the legally cognizable particular social group that she identified, and that the persecution she fears actually was, or will be, inflicted on account of her membership in that group. See Gonzalez Cano v. Lynch, 809 F.3d 1056, 1058 (8th Cir. 2016) (noting that petitioner "must prove first" that he is a member of a cognizable particular social group); De Castro-Gutierrez v. Holder, 713 F.3d 375, 381 (8th Cir. 2013) (noting that, even if proposed particular social group were cognizable, petitioner's claim would fail because she did not prove her membership in that group "in the first place"); Safaie v. I.N.S., 25 F.3d 636, 640 (8th Cir. 1994) (noting that petitioner must "identify a group that constitutes 'a particular social group[,]' . . . establish that [she] is a member of that group, and . . . show that [she] would be persecuted or has a well-founded fear of persecution based on that membership" (citation omitted)), *superseded by statute on other grounds, as recognized* in Rife v. Ashcroft, 374 F.3d 606, 614-15 (8th Cir. 2004). Fuentes has failed to make the requisite showing.

Fuentes identified her proposed particular social group as Honduran women in domestic relationships who are unable to leave their relationships. As noted by Fuentes, the BIA concluded in Matter of A-R-C-G-, 26 I.&N. Dec. 388, 392, 392-95 (BIA 2014), that "married women in Guatemala who are unable to leave their relationship[s]" constitute a legally cognizable particular social group for purposes of asylum and withholding of removal. But in A-R-C-G-, the petitioner's actual membership in the proposed particular social group was undisputed. Id. The petitioner there attempted to flee her relationship on several occasions, but each time her husband tracked her down and either threatened to kill her if she did not return to him, or persuaded her to return by promising to cease his abusive treatment. Id. at 389. Here, by contrast, Fuentes herself testified—and the IJ and the BIA

-7-

subsequently found—that she was, in fact, able to leave her relationship with Santos. Indeed, Fuentes left Santos in 2009 and resided in Honduras safely for approximately five years, during which time she traveled and worked in several different parts of Honduras, entered into a relationship with another man, and gave birth to a second child—all without having any contact whatsoever with Santos. Fuentes also acknowledged that Santos never contacted Oslis while he was living with her or her parents. Substantial evidence supports the BIA's finding that Fuentes failed to demonstrate that she was a member of her proposed particular social group and that she was thus ineligible for asylum or withholding of removal.[3] See Ngugi, 826 F.3d at 1136; see also Saldana, 820 F.3d at 978 (noting that failure to meet standard of proof for asylum necessarily results in failure to meet higher standard of proof for withholding of removal).

Although Fuentes is not required to establish her membership in a cognizable particular social group to qualify for relief under the CAT, she is required to show a likelihood that she would be tortured if she were returned to Honduras and that the torture would be inflicted "with the consent or acquiescence of a public official." Garcia, 746 F.3d at 873 (quoting 8 C.F.R. § 1208.18(a)(1)). Fuentes has failed to make this showing. The basis of her fear is the domestic abuse inflicted upon her by Santos—a private actor. She claims that, because of the Honduran government's complacency and ineffectiveness in the face of a long-standing, widespread, and ongoing domestic-violence problem, the government will not protect her if she is returned to Honduras. But she did not establish that the Honduran government was aware of Santos's conduct, much less that it consented to or acquiesced in that conduct. Fuentes testified that she never reported Santos to the police or to other government officials—and thus she never gave the government the opportunity to

---

[3]Fuentes argues that the BIA erred in failing to consider her second proposed particular social group, composed of those Honduran women who are unable to leave the fathers of their children. This argument similarly fails, for Fuentes's ability to leave Santos precludes her claim of membership in this group.

protect her from Santos's conduct. See Menjivar v. Gonzales, 416 F.3d 918, 922 (8th Cir. 2005) (noting that substantial evidence supported finding that the government was not unable or unwilling to control alleged persecutor, where petitioner never reported incidents and the government lacked opportunity to respond). On this record, a reasonable adjudicator would not be compelled to find that the incidents described by Fuentes occurred with the imprimatur or acquiescence of Honduran officials.

Fuentes argues that reporting Santos's conduct to the police would have been futile, and she cites to country reports, expert affidavits, and other documents in the record indicating that domestic violence is a widespread problem in Honduras, that impunity for perpetrators is common, and that the laws and institutions in place to assist victims are largely ineffectual. She contends that this evidence compels the conclusion that the Honduran government condones domestic violence or, at the very least, is completely helpless to stop it, and that the BIA failed to assign this evidence appropriate weight. We disagree. The IJ and the BIA considered the documentary evidence she proffered and acknowledged that there is ongoing violence against women in Honduras, but concluded that Fuentes had not established that the government generally consents to or acquiesces in domestic violence. See, e.g., Garcia, 746 F.3d at 873 ("Demonstrating acquiescence of a public official requires proof that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." (citation omitted)). It is evident that the Honduran government has not eliminated the problem of domestic violence and that it has fallen short in providing the necessary resources to address the issue. But as we have observed, "[i]nability to control private actors is an imprecise concept that leaves room for discretion by the [BIA]." Saldana, 820 F.3d at 977. The record does not compel a finding that the Honduran government would acquiesce in any harm that Santos might inflict in the future. See id. at 976-77 (noting that "[n]either difficulty controlling private behavior nor failure to solve every crime or to act on every report

is sufficient to" show that the government condones the conduct or is unable to protect the victims).

Because the BIA did not err in concluding that Fuentes failed to establish that she was a member of her self-described social groups or that the Honduran government will consent to or acquiesce in her mistreatment if she is returned to that country, we need not address whether her proposed particular social groups were cognizable or whether the mistreatment she has suffered or allegedly will suffer rose to the level of persecution. See Gonzalez Cano, 809 F.3d at 1059 (concluding that, because petitioner did not demonstrate likelihood of persecution on account of membership in a particular social group, court need not reach whether government was unable or unwilling to control persecutors); Saldana, 820 F.3d at 975-77 (declining to address in first instance particular-social-group issue, but affirming denial of relief due to insufficient evidence that harm by private actors was "persecution" that government condoned or was unable to control); see also Salman, 687 F.3d at 995 (concluding that, because petitioner's failure to establish government acquiescence in harassment was fatal to asylum claim, the court need not address whether harassment rose to level of persecution or was based on a statutorily protected ground); Gutierrez-Vidal v. Holder, 709 F.3d 728, 733 n.1 (8th Cir. 2013) (noting that because petitioner did not demonstrate harm amounting to persecution, asylum claim failed regardless of relocation issue).

The petition for review is denied.

_____