# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3421
_____

Richardson Osaigbovo Edionseri

*Petitioner*

v.

Jefferson B. Sessions, III, Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: June 7, 2017
Filed: June 26, 2017

_____

Before WOLLMAN, ARNOLD, and GRUENDER, Circuit Judges.

_____

ARNOLD, Circuit Judge.

Nigerian native and citizen Richardson Edionseri was admitted to the United States in December 2006 on condition that he attend college. In September 2010, Edionseri petitioned for asylum, withholding of removal, and relief under the Convention Against Torture and dropped out of college a few months later. While Edionseri's petition was pending, the Department of Homeland Security charged him with being removable because he was no longer a student. *See* 8 U.S.C.

§ 1227(a)(1)(C)(i). Edionseri conceded that he was removable but argued that he was entitled to the relief sought in his petition.

We first summarize Edionseri's testimony at his hearing. He was born in Nigeria in 1973, but his family later moved to India. When he was 16 years old, he saw a wizard kill his father; the devil had commissioned the wizard to kill his father to transform Edionseri into a false prophet. After his father's death, his family moved back to Nigeria, eventually settling in Lagos. There, Edionseri's mother purchased rental property where the family lived along with tenants, some of whom became operatives for the devil. One tenant inserted a worm inside Edionseri while he slept; another tenant raised a furor by accusing Edionseri's mother of witchcraft and Edionseri of wizardry after the tenant's mother had died. Around this time, Edionseri began having visions and prophesying, and, when his prophecies did not come true, some in the community accused him of being a false prophet. At one point Edionseri was having a vision while cutting glass, and a spirit threw glass into his eye.

In 2001 an imbroglio erupted between Edionseri's family and a tenant named Akpoma. The family suspected Akpoma of leaving stolen cars at the rental property, so they called police. When several officers arrived, Akpoma prevented their entry by padlocking a gate; he proceeded to beat Edionseri and his mother with a tire iron. A few days later, another tenant assaulted Edionseri, his mother, and his sister in the presence of police. The family was eventually able to evict the troublesome tenants around 2002 or 2003.

Edionseri also explained that the devil had placed demons inside him, causing various medical ailments. One particularly troublesome ailment was an offensive odor that marked Edionseri as demonic, leading the community to ostracize him. He underwent four exorcisms in Nigeria, but to no avail. He sought help from various medical and religious personnel but nothing helped. Edionseri fears returning to Nigeria because people will again associate his smell with demonic forces and

ostracize, harm, or torture him. He maintains that belief in wizardry in Nigeria is common but not accepted. He submitted articles recounting that some people, including children, have been tortured in other parts of Nigeria on suspicion of being a wizard or witch.

After finding that Edionseri was credible (meaning, presumably, that he was not prevaricating) and excusing his failure to file for asylum within one year of his arrival, *see* 8 U.S.C. § 1158(a)(2)(B), (D), the IJ concluded, among other things, that Edionseri had not suffered past persecution in Nigeria because the harms were not inflicted by the government or private actors that the government was unable or unwilling to control. The IJ also concluded that, though Edionseri subjectively feared future persecution should he be removed to Nigeria, his fear was not objectively reasonable. He was therefore not entitled to asylum, withholding of removal, or CAT relief. The BIA upheld the decision for largely the same reasons.

We generally review the BIA's decision as the final agency action, but when the BIA essentially adopts the IJ's opinion while adding some of its own reasoning, we review both decisions. *Juarez Chilel v. Holder*, 779 F.3d 850, 853 (8th Cir. 2015). We review the BIA's holdings on an alien's eligibility for asylum, withholding of removal, and CAT relief under the deferential substantial-evidence standard. *Id.*

To be eligible for asylum, Edionseri must be a "refugee," *see* 8 U.S.C. § 1158(b)(1)(A), which is someone who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of" certain statutorily protected grounds. 8 U.S.C. § 1101(a)(42). An alien petitioning for asylum must demonstrate past persecution or a well-founded fear of future persecution due to one of the protected grounds. *Garcia-Colindres v. Holder*, 700 F.3d 1153, 1156 (8th Cir. 2012). The fear of future persecution must be both subjectively genuine and objectively reasonable. *Id.* at 1158. We have held, moreover, that the persecution cannot be at the hands of just anyone; it must be inflicted by a country's government

or by people or groups that the government is unable or unwilling to control. *Saldana v. Lynch*, 820 F.3d 970, 975–76 (8th Cir. 2016). In showing a government's inability or unwillingness to control private parties, the "applicant must show that the government either condones the conduct or is unable to protect the victims." *Id.* at 976.

We agree with the IJ and the BIA that the harms that Edionseri describes were not persecution because they were not inflicted by the government or private parties that the government was not able to control. Edionseri asserts that supernatural forces inflicted much of the harm, and it is true as a literal matter that these are forces that the Nigerian government was not able to control. But the IJ and BIA concluded that the word "persecution" in the governing statute does not include harms inflicted by supernatural forces or beings. We give substantial deference to the BIA's interpretation of questions of immigration law, *see Popescu-Mateffy v. Holder*, 678 F.3d 612, 615 (8th Cir. 2012), and we think that this interpretation is abundantly reasonable, especially since Edionseri does not identify a plausible way for the Nigerian government to protect against supernatural forces or suggest how our government might be better equipped to do so. It is hardly unreasonable to hold that Congress would not require governments to do things that are quite evidently impossible.

To the extent that Edionseri asserts that the Nigerian government was unable or unwilling to control the devil's human agents, we think that substantial evidence shows otherwise. The incident involving Akpoma shows that at least five police officers responded to a call for help. When they were thwarted by the locked gate, they demanded entry, and once they entered, they stopped the beating and ordered everyone to return home. They invited people to make statements, but nothing in the record indicates that anyone, including Edionseri or members of his family, made any statements. And the mere fact that the police made no arrests after this incident is insufficient to show that the government condones the conduct or is unable to protect

-4-

the victims. *See Saldana*, 820 F.3d at 976. As for the assault that occurred a few days later, the record about this incident is too incomplete for us to conclude that the government condoned the conduct or was unable to help the victims. We do know that the police again responded to Edionseri's call for help. He says that he, his mother, and his sister were all assaulted in the presence of police, but we do not know anything more about the circumstances. Perhaps the police were attempting to break up the fight when the supposed assault occurred. We simply cannot tell. We also cannot tell what the "assault" amounted to or how the actions of the police fell short, if they did. Keeping in mind that the "[i]nability to control private actors is an imprecise concept that leaves room for discretion by the agency," *id.* at 977, we conclude that substantial evidence supports the agency's conclusion.

Substantial evidence also supports the agency's determination that Edionseri has no objectively reasonable fear of future persecution by the government or someone that the government was unable or unwilling to control. As we have already said, harm inflicted by supernatural forces is not "persecution." As for harm caused by the devil's human agents, we think that Edionseri is just as susceptible to such harm here as in Nigeria because, as the IJ observed, supernatural beings and their agents "are theoretically capable of targeting an asylum applicant wherever he goes, including the United States." And as for potential harm caused by the Nigerian people's alleged animosity toward suspected witches and wizards, we note that Edionseri's mother still lives in the same home in Lagos, and nothing has happened to her in more than a decade even though she was accused of witchcraft at the same time that Edionseri was accused of being a wizard, apparently because he was his mother's offspring. *See Bin Jing Chen v. Holder*, 776 F.3d 597, 601 (8th Cir. 2015). The tenants that caused these incidents have also long been evicted, so it is unreasonable to expect harm from them. The Nigerian government, moreover, has made progress in curbing wizard torture, demonstrating both that Edionseri is less likely to be persecuted now than during the ten years or so when he lived in Nigeria under the wizard label and that the

government is not unwilling or unable to protect him against such harm. We cannot overturn the agency's decision on this record.

Because the agency properly rejected Edionseri's asylum claim, he necessarily failed to meet the standard for withholding of removal since relief on this ground also requires showing that the government or private parties that the government is unable or unwilling to control inflicted or will inflict harm. *See De Castro-Gutierrez v. Holder*, 713 F.3d 375, 380 (8th Cir. 2013). Likewise, to qualify for CAT relief, Edionseri must show that a public official will consent or acquiesce in the torture. *Saldana*, 820 F.3d at 978. Given the record evidence showing the Nigerian government's efforts to curtail the torture of suspected witches and wizards, we conclude that substantial evidence supports the agency's denial of Edionseri's request for CAT relief. Because our discussion fully resolves the claims presented in Edionseri's petition for review, we need not address the other grounds for the agency's denial of relief.

Petition denied.

_____