# United States Court of Appeals

### For the Eighth Circuit

_____

No. 16-3903

_____

Jose Noel Romero-Larin

*Petitioner*

v.

Jefferson B. Sessions, III, Attorney General of the United States

*Respondent*

_____

No. 17-1868

_____

Jose Noel Romero-Larin

*Petitioner*

v.

Jefferson B. Sessions, III, Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: October 19, 2017
Filed: May 8, 2018
[Unpublished]

_____

Before GRUENDER and BENTON, Circuit Judges, and TUNHEIM, District Judge.[1]

_____

PER CURIAM.

Jose Noel Romero-Larin, a native and citizen of El Salvador, entered the United States on June 23, 2010. On June 28, 2010, he was apprehended by the Department of Homeland Security, which later initiated removal proceedings pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I). Romero-Larin eventually filed an application seeking asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). In February 2015, Romero-Larin testified before an Immigration Judge ("IJ") regarding his fear of returning to El Salvador. He explained his role in the Coordinating Committee of Churches ("CCC") of San Martin and discussed the close relationship between CCC and a prominent political party, the Farabundo Marti National Liberation Front ("FMLN"). The municipality of San Martin created CCC in 2007, when FMLN was in power, and proceeded to fund and support some activities sponsored by CCC. Romero-Larin began working with CCC at its inception. CCC is perceived to be "red"; that is, supportive of FMLN. The right-wing Nationalist Republican Alliance ("ARENA") is thought to be unsupportive of CCC's association with FMLN.

----

[1]The Honorable John R. Tunheim, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

Romero-Larin also testified about death threats he received in 2007 and 2010, which ultimately prompted his flight to the United States. In late 2007, he received a phone call telling him "to stop doing or interfering into the politics" and threatening that, if he continued, "very bad things" would follow. He received a similar call two weeks later but "did not give any importance" to either call because he did not consider himself to be involved in anything political. Romero-Larin did not receive any more threats until early 2010, when he was approached by a young man whom he recognized as a member of the gang Mara-18. The man told Romero-Larin that "some politician paid . . . the Mara-18 to kill [him] because [he] was getting involved in politics for this political party." Romero-Larin suspected the order came from a politician belonging to the ARENA party. After the gang member's threat, Romero-Larin's cousin, also a member of the Mara-18, told Romero-Larin's mother that Romero-Larin should leave because there was an order for him to be killed. Romero-Larin claims he did not report the threats because he knew of people being killed for doing so. He came to the United States soon after learning of his cousin's warning.

After conducting an evidentiary hearing, the IJ found Romero-Larin's testimony credible but denied his application for asylum, finding that Romero-Larin failed to establish past persecution or a well-founded fear of future persecution. Romero-Larin appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). The BIA agreed with the IJ and dismissed Romero-Larin's appeal. In addition to finding no clear error of fact or mistake of law in the IJ's assessment, the BIA also found that Romero-Larin's "asylum and withholding of removal claims fail because he did not establish that the source of harm is the government or an individual or group the government is unable or unwilling to control." Romero-Larin timely petitioned this court to review the BIA's decision. While this first petition was pending, gang members in El Salvador shot and killed Romero-Larin's father. Romero-Larin then filed a motion to reopen the proceedings before the BIA to present evidence of his father's murder. The BIA considered the evidence but denied the motion, finding that it would "not . . . change the outcome of the proceedings." In a

second petition, Romero-Larin asks this court to review that decision as well, arguing that the BIA abused its discretion by denying the motion. We consider each petition in turn.

To establish eligibility for asylum, an applicant carries the burden of showing that he meets the definition of "refugee": a person who is "unable or unwilling to return to . . . [his] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). If the applicant can establish past persecution, then he is entitled to a presumption that his fear of future persecution on the basis of the original claim is well-founded. 8 C.F.R. § 1208.13(b)(1). Furthermore, "as relevant to past persecution or a well-founded fear of future persecution, the applicant must show that the assaults were either condoned by the government or were committed by private actors that the government was unwilling or unable to control." *Gutierrez-Vidal v. Holder*, 709 F.3d 728, 732 (8th Cir. 2013) (internal quotation marks omitted).

"We review the [BIA's] decision for substantial evidence, and we must uphold administrative findings of fact unless any reasonable adjudicator would be compelled to conclude to the contrary." *Nanic v. Lynch*, 793 F.3d 945, 947 (8th Cir. 2015) (citing 8 U.S.C. § 1252(b)(4)(B); *INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992)). "Because the BIA's decision is the final decision of the agency, it is the subject of our review. To the extent, however, that the BIA adopted the findings or the reasoning of the IJ, we also review the IJ's decision as part of the final agency action." *Falaja v. Gonzales*, 418 F.3d 889, 894 (8th Cir. 2005) (citation omitted); *see also Singh v. Mukasey*, 543 F.3d 1, 4 (1st Cir. 2008) ("When the BIA both adopts the decision of an immigration judge and adds a new ground for upholding the result, this court reviews the IJ's decision as though it were the BIA's to the extent of the adoption, and the BIA's decision as to the additional ground." (internal quotation marks omitted)).

Here, the BIA permissibly concluded that Romero-Larin's asylum claim failed "because he did not establish that the source of harm is the government or an individual or group the government is unable or unwilling to control." As we have explained, "To establish persecution based on the conduct of private actors, an applicant must show that the government either condones the conduct or is unable to protect the victims." *Saldana v. Lynch*, 820 F.3d 970, 976 (8th Cir. 2016). In other words, the government in question must demonstrate "'complete helplessness' to protect victims of private violence." *Id.* at 977. Because the government's ability to control the persecutors is a question of fact, *see id.* at 976, we must uphold the agency's finding "unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B).

Romero-Larin argues that the BIA erroneously premised its conclusion regarding the "government control" issue on the notion that the ARENA party is his persecutor. Romero-Larin contends that "[c]ontrol over that party is immaterial, because the ARENA party is not [his] persecutor." Instead, he argues, his persecutor is the Mara-18 gang because that is who "actually threatened to kill him." Romero-Larin proceeds to ground his entire "government control" argument in the Salvadoran government's alleged inability to control the Mara-18, without pointing to any evidence that suggests the Salvadoran government is unable or unwilling to control the ARENA party.

Both the IJ and BIA considered ARENA to be the true source of the threat. Indeed, the IJ explained that Mara-18 was just "the weapon delivering the threats," and the BIA referred to ARENA as Romero-Larin's "alleged persecutor." We accept that reasonable characterization as supported by substantial evidence on the record as a whole. After all, the Mara-18 member who delivered the threat told Romero-Larin that "a member of a political party" had hired the gang to kill him, and Romero-Larin offered no reason why Mara-18 would persecute him independent of ARENA's request. In fact, Romero-Larin suspects that ARENA was responsible for the threat.

-5-

Thus, given that Romero-Larin believes he is being targeted by ARENA for his work with CCC and its association with FMLN—"the majority, ruling party"—and given that he offers no evidence that the FMLN government would be unwilling or unable to control a minority party, a reasonable adjudicator would not be compelled to find that the Salvadoran government is helpless to control ARENA. Therefore, the BIA permissibly concluded that Romero-Larin failed to show persecution by an individual or group that the government is unable or unwilling to control and denied his asylum claim.[2]

Since Romero-Larin has not met the standard for asylum, "it follows that [he] did not meet the higher standard of proof for withholding of removal." *Saldana*, 820 F.3d at 978.[3]

In his second petition, Romero-Larin challenges the BIA's denial of his motion to reopen after he submitted evidence that his father had been shot and killed in 2016, allegedly by a member of Mara-18. He claims the BIA distorted his claim by failing to consider whether the new evidence rendered his fear of persecution objectively reasonable and by instead considering the effect the new evidence would have on, among other things, the "government control" issue.

---

[2]Because the "government control" issue is dispositive of both the "past persecution" and "well-founded fear of future persecution" determinations—and thus dispositive of Romero-Larin's claim for asylum—we decline to address other issues raised by the parties. *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) (per curiam) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

[3]Romero-Larin does not meaningfully argue on appeal that he meets the standard for relief under the CAT. Therefore, we deem that claim waived. *See Chay-Velasquez v. Ashcroft*, 367 F.3d 751, 756 (8th Cir. 2004).

"We review the BIA's denial of the motion to reopen for abuse of discretion." *Villatoro-Ochoa v. Lynch*, 844 F.3d 993, 994 (8th Cir. 2017) (internal quotation marks omitted). The BIA's decision should be overturned only "where it gives no rational explanation for its decision, departs from its established policies without explanation, relies on impermissible factors or legal error, or ignores or distorts the record evidence." *Quinteros v. Holder*, 707 F.3d 1006, 1009 (8th Cir. 2013). Romero-Larin carries a "heavy burden," *see INS v. Abudu*, 485 U.S. 94, 110 (1988), and must show the new facts "would likely change the result in the case" in order to merit a reopening of proceedings, *Xiu Ling Chen v. Holder*, 751 F.3d 876, 878 (8th Cir. 2014).

Because the reasonable-fear determination would not have changed the outcome of the first petition—where the BIA independently grounded its decision in, among other things, Romero-Larin's failure to show the government was unwilling or unable to control those threatening Romero-Larin—and because Romero-Larin expressly argues that he limited his motion to reopen to the reasonable-fear issue, the BIA did not abuse its discretion in denying the motion. Even if the BIA were to rule in Romero-Larin's favor on the reasonable-fear issue, he would nonetheless be denied asylum. *See id.*

For the foregoing reasons, we deny both petitions for review.[4]

_____

_____

[4]We deny as moot the Government's motion to strike portions of Romero-Larin's briefs that rely on various news articles because none of the contested briefing is necessary to the resolution of the case.